## THE LATE CORPORATION OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS *v.* UNITED STATES.

### ROMNEY *v.* UNITED STATES

Nos. 1031, 1054. Argued January 16, 17, 18, 1889.— Decided May 19, 1890.

The Church of Jesus Christ of Latter-Day Saints was incorporated February, 1851, by an act of assembly of the so-called State of Deseret, which was afterwards confirmed by act of the territorial legislature of Utah, the corporation being a religious one, and its property and funds held for the religious and charitable objects of the society, a prominent object being the promotion and practice of polygamy, which was prohibited by the laws of the United States. Congress, in 1887, passed an act repealing the act of incorporation, and abrogating the charter; and directing legal proceedings for seizing its property and winding up its affairs: *Held* that,

(1) The power of Congress over the Territories is general and plenary, arising from the right to acquire them; which right arises from the power of the government to declare war and make treaties of peace, and also, in part, arising from the power to make all needful rules and regulations respecting the territory or other property of the United States;

(2) This plenary power extends to the acts of the legislatures of the Territories, and is usually expressed in the organic act of each by an express reservation of the right to disapprove and annul the acts of the legislature thereof;

(3) Congress had the power to repeal the act of incorporation of the Church of Jesus Christ of Latter-Day Saints, not only by virtue of its general power over the Territories, but by virtue of an express reservation in the organic act of the Territory of Utah of the power to disapprove and annul the acts of its legislature;

(4) The act of incorporation being repealed, and the corporation dissolved, its property, in the absence of any other lawful owner, devolved to the United States, subject to be disposed of according to the principles applicable to property devoted to religious and charitable uses; the real estate, however, being also subject to a certain condition of forfeiture and escheat contained in the act of 1862;

(5) The general system of common law and equity, except as modified by legislation, prevails in the Territory of Utah, including therein the law of charitable uses;

(6) By the law of charitable uses, when the particular use designated is unlawful and contrary to public policy, the charity property is subject to be applied and directed to lawful objects most nearly corresponding to its original destination, and will not be returned to the donors, or their heirs or representatives, especially where it is impossible to identify them;

(7) The court of chancery, in the exercise of its ordinary powers over trusts and charities, may appoint new trustees on the failure or discharge of former trustees; and may compel the application of charity funds to their appointed uses, if lawful; and, by authority of the sovereign power of the State, if not by its own inherent power, may reform the uses when illegal or against public policy by directing the property to be applied to legal uses, conformable, as near as practicable, to those originally declared;

(8) In this country the legislature has the power of *parens patriæ* in reference to infants, idiots, lunatics, charities, etc., which in England is exercised by the crown; and may invest the court of chancery with all the powers necessary to the proper superintendence and direction of any gift to charitable uses;

(9) Congress, as the supreme legislature of Utah, had full power and authority to direct the winding up of the affairs of the Church of Jesus Christ of Latter-Day Saints as a defunct corporation, with a view to the due appropriation of its property to legitimate religious and charitable uses conformable, as near as practicable, to those to which it was originally dedicated. This power is distinct from that which may arise from the forfeiture and escheat of the property under the act of 1862;

(10) The pretence of religious belief cannot deprive Congress of the power to prohibit polygamy and all other open offences against the enlightened sentiment of mankind.

On behalf of the court MR. JUSTICE BRADLEY stated the case as follows:[1]

The church of the Mormons, or, as they call themselves, the Church of Latter-Day Saints, was first organized as a corporation under an act of assembly of the provisional government which they set up in Utah under the name of the State of Deseret. The act was dated February 8, 1851, and was in the usual form of acts of incorporation. The title and first three sections were as follows:

"An ordinance incorporating the Church of Jesus Christ of Latter-Day Saints.

"SEC. 1. *Be it ordained by the General Assembly of the State of Deseret,* That all that portion of the inhabitants of said State which now are or hereafter may become residents therein, and which are known and distinguished as 'the Church of Jesus Christ of Latter-Day Saints,' are hereby incorporated, constituted, made and declared a body corporate, with perpetual succession, under the original name and style of 'The Church of Jesus Christ of Latter-Day Saints,' as now organized, with full power and authority to sue and be sued, defend and be defended, in all courts of law or equity in this State; to establish, order and regulate worship, and hold and occupy real and personal estate, and have and use a seal, which they may alter at pleasure.

"SEC. 2. *And be it further ordained,* That said body or church, as a religious society, may, at a general or special conference, elect one 'trustee in trust,' and not to exceed twelve assistant trustees, to receive, hold, buy, sell, manage, use and control the real and personal property of said church, which said property shall be free from taxation ; . . . said trustee or assistant trustees may receive property, real or personal, by gift, donation, bequest, or in any manner not incompatible

---

[1] The order of arrangement of the statutes and ordinances varies in this statement from that adopted in the opinion on file; the matter in the two statements being identical. The new arrangement was made, on behalf of the Court, by MR. JUSTICE BRADLEY, and is adopted by the reporter under his directions.

with the principles of righteousness or the rules of justice, inasmuch as the same shall be used, managed or disposed of for the benefit, improvement, erection of houses for public worship and instruction, and the well being of said church.

"SEC. 3. *And be it further ordained*, That, as said church holds the constitutional and original right, in common with all civil and religious communities, 'to worship God according to the dictates of conscience,' to reverence communion agreeably to the principles of truth, and to solemnize marriage compatible with the revelations of Jesus Christ for the security and full enjoyment of all blessings and privileges embodied in the religion of Jesus Christ free to all, it is also declared that such church does and shall possess and enjoy continually the power and authority, in and of itself, to originate, make, pass and establish rules, regulations, ordinances, laws, customs and criterions for the good order, safety, government, conveniences, comfort and control of said church and for the punishment or forgiveness of all offences relative to fellowship according to church covenants; that the pursuit of bliss and the enjoyment of life in every capacity of public association, domestic happiness, temporal expansion, or spiritual increase upon the earth may not legally be questioned: *Provided, however*, That each and every act or practice so established or adopted for law or custom shall relate to solemnities, sacraments, ceremonies, consecrations, endowments, tithings, marriages, fellowship or the religious duties of man to his Maker, inasmuch as the doctrines, principles, practices or performances support virtue and increase morality, and are not inconsistent with or repugnant to the Constitution of the United States or of this State and are founded in the revelations of the Lord." Comp. Laws of Utah, 1876, p. 232.

Congress had passed an organic act for establishing a government in the Territory of Utah on the 9th of September, 1850 (9 Stat. 453); but the territorial government was not organized until after the passage of the church charter as above stated. After its organization the territorial legislature, on two different occasions, passed confirmatory acts which had the effect of validating said charter. One was a

joint resolution, passed October 4, 1851, declaring " That the laws heretofore passed by the provisional government of the State of Deseret, and which do not conflict with the organic act of said Territory, be, and the same are hereby declared to be, legal and in full force and virtue, and shall so remain until suspended by the action of the legislative assembly of the Territory of Utah." The other was an act approved January 19, 1855, entitled " An act in relation to the compilation and revision of the laws and resolutions in force in Utah Territory, their publication and distribution," which reënacted the said charter.

On the 1st of July, 1862, the following act of Congress was approved, to wit:

" An act to punish and prevent the Practice of Polygamy in the Territories of the United States, and other Places, and disapproving and annulling Certain Acts of the Legislative Assembly of the Territory of Utah.

" *Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That every person having a husband or wife living, who shall marry any other person, whether married or single, in a Territory of the United States, or other place over which the United States have exclusive jurisdiction, shall, except in the cases specified in the proviso to this section, be adjudged guilty of bigamy, and, upon conviction thereof, shall be punished by a fine not exceeding five hundred dollars, and by imprisonment for a term not exceeding five years: *Provided, nevertheless,* That this section shall not extend to any person by reason of any former marriage whose husband or wife by such marriage shall have been absent for five successive years without being known to such person within that time to be living; nor to any person by reason of any former marriage which shall have been dissolved by the decree of a competent court; nor to any person by reason of any former marriage which shall have been annulled or pronounced void by the sentence or decree of a competent court on the ground of the nullity of the marriage contract.

" SEC. 2. *And be it further enacted,* That the following ordi-

nance of the provisional government of the State of Deseret, so. called, namely, ' An ordinance incorporating the Church of Jesus Christ of Latter-Day Saints,' passed February eight, in the year eighteen hundred and fifty-one, and adopted, reënacted and made valid by the governor and legislative assembly of the· Territory of Utah by an act passed January nineteen, in the year eighteen hundred and fifty-five, entitled ' An act in relation to the compilation and revision of the laws and resolutions in force in Utah Territory, their publication and distribution,' and all other acts and parts of acts heretofore passed by the said legislative assembly of the Territory of Utah, which establish, support, maintain, shield or countenance polygamy be, and the same hereby are, disapproved and annulled: *Provided*, That this act shall be so limited and construed as not to affect or interfere with the right of property legally acquired under the ordinance heretofore mentioned, nor with the right ' to worship God according to the dictates of conscience,' but only to annul all acts and laws which establish, maintain, protect or countenance the practice of polygamy, evasively called spiritual ·marriage, however disguised by legal or· ecclesiastical solemnities, sacraments, ceremonies, consecrations or other contrivances.

" SEC. 3. *And be it further enacted*, That it shall not be lawful for any corporation or association for religious or charitable purposes to acquire or hold real estate in any Territory of the United States during the existence of the territorial government of a greater value than fifty thousand dollars; and all real estate acquired or held by any such corporation or association contrary to the provisions of this act shall be forfeited and escheat to the United States: *Provided*, That existing vested rights in real estate shall not be impaired by the provisions of this section." 12 Stat. 501.

Another act, known as the Edmunds. act, was approved March 22, 1882, entitled " An act to amend section 5352 of the Revised Statutes of the United States in reference to bigamy and for other purposes." 22 Stat. 30, c. 47. This act contained stringent provisions against the crime of polygamy, and has ·frequently come under the consideration of this court, and need not be recited in detail.

On the 19th of February, 1887, another act of Congress was passed, and became a law by not being returned by the President, 24 Stat. 635, c. 397, which made additional provisions as to the prosecution of polygamy, and in the 13th, 17th, and 26th sections, enacted as follows:.

"SEC. 13. That it shall be the duty of the Attorney General of the United States to institute and prosecute proceedings to forfeit and escheat to the United States the property of corporations obtained or held in violation of section three of the act of Congress approved the first day of July, eighteen hundred and sixty-two, entitled 'An act to punish and prevent the practice of polygamy in the Territories of the United States and other places, and disapproving and annulling certain acts of the legislative assembly of the Territory of Utah, or in violation of section eighteen hundred and ninety of the Revised Statutes of the United States'; and all such property so forfeited and escheated to the United States shall be disposed of by the Secretary of the Interior, and the proceeds thereof applied to the use and benefit of the common schools in the Territory in which such property may be: *Provided,* That no building, or the grounds appurtenant thereto, which is held and occupied exclusively for purposes of the worship of God, or parsonage connected therewith, or burial ground, shall be forfeited."

"SEC. 17. That the acts of the legislative assembly of the Territory of Utah incorporating, continuing or providing for the corporation known as the Church of Jesus Christ of Latter-Day Saints, and the ordinance of the so-called general assembly of the State of Deseret incorporating the Church of Jesus Christ of Latter-Day Saints, so far as the same may now have legal force and validity, are hereby disapproved and annulled; and the said corporation, in so far as it may now have, or pretend to have, any legal existence, is hereby dissolved. That it shall be the duty of the Attorney General of the United States to cause such proceedings to be taken in the Supreme Court of the Territory of Utah as shall be proper to execute the foregoing provisions of this section and to wind up the affairs of said corporation conformably to law; and in such proceedings the court shall have power, and it shall be

its duty, to make such decree or decrees as shall be proper to effectuate the transfer of the title to real property now held and used by said corporation for places of worship, and parsonages connected therewith, and burial grounds, and of the description mentioned in the proviso to section thirteen of this act and in section twenty-six of this act, to the respective trustees mentioned in section twenty-six of this act; and for the purposes of this section said court shall have all the powers of a court of equity."

"Sec. 26. That all religious societies, sects and congregations shall have the right to have and to hold, through trustees appointed by any court exercising probate powers in a Territory, only on the nomination of the authorities of such society, sect or congregation, so much real property for the erection or use of houses of worship, and for such parsonages and burial grounds as shall be necessary for the convenience and use of the several congregations of such religious society, sect or congregation."    24 Stat. 637, 638 and 641.

In pursuance of the 13th section above recited, proceedings were instituted by information on behalf of the United States in the Third District Court of the Territory of Utah, for the purpose of having declared forfeited and escheated to the government the real estate of the corporation called the Church of Jesus Christ of Latter-Day Saints, except a certain block in Salt Lake City used exclusively for public worship.

On the 30th of September, 1887, the bill in the present case was filed in the Supreme Court of the Territory, under the 17th section of the act for the appointment of a receiver to collect the debts due to said corporation and the rents, issues and profits of its real estate, and to take possession of and manage the same for the time being; and for a decree of dissolution and annulment of the charter of said corporation, and other incidental relief. The bill is in the name of the United States, and was brought by direction of the Attorney General, against "the late corporation known and claiming to exist as the Church of Jesus Christ of Latter-Day Saints," and John Taylor, "late trustee in trust," and eleven other persons late assistant trustees of said corporation.

The bill sets forth the act of incorporation of the said church, and its confirmation by the territorial legislature, as before expressed, and then states, further, that John Taylor (since deceased) on and prior to the 19th of February, 1887, was trustee in trust, and the other individual defendants were the assistant trustees of the corporation;

That the corporation acquired and held large amounts of real and personal property in the Territory of Utah after the 1st of July, 1862, — the value of the real estate being about $2,000,000, and the value of the personal property about $1,000,000 as held and owned on the 19th of February, 1887, and which the defendants still claim to hold in violation of the laws of the United States;

That the corporation was a corporation for religious or charitable purposes;

That by the third section of the act of July 1st, 1862, 12 Stat. 501, c. 126, § 3, reënacted as section 1890 of the Revised Statutes of the United States, any corporation for religious or charitable purposes was forbidden to acquire or hold real estate in any territory, during the existence of the territorial government, of greater value than $50,000; and that more than this value of the property of the said corporation has been acquired since July 1st, 1862, which is not held or occupied as a building or ground appurtenant thereto for the purpose of the worship of God, or a parsonage connected therewith, or burial ground;

That, therefore, the real estate referred to, owned by the corporation, is subject to escheat to the United States;

That on the 19th day of February, 1887, (by the said act of that date,) the charter and act of incorporation of the corporation aforesaid was disapproved, repealed and annulled by Congress, and the corporation was dissolved, and all the real estate owned and occupied by it, in excess of $50,000, not held or occupied for the worship of God, etc., was subject to escheat to the United States;

That the said corporation, and the successor of said John Taylor as trustee in trust, (whose name is unknown, and who is asked to be made a party to the bill,) and the other defend-

ants, assistant trustees, wrongfully and in violation of the laws of the United States still claim to hold and exercise the powers which were held and exercised by said corporation, and are unlawfully possessing and using the said real estate, and claim the right to sell, use and dispose of the same;

That since the 19th of February, 1887, there is no person lawfully authorized to take charge of, manage, preserve, or control said property, and the same is subject to irreparable and irremediable loss and destruction.

The bill prays that a receiver may be appointed to receive and hold all the property of the corporation; that a decree be made declaring the dissolution and annulment of the charter of the said corporation; that the court appoint a commissioner to select and set apart out of the real estate which was held and occupied by the corporation such real estate as may be lawfully held for religious uses; make necessary orders, and take proceedings to wind up the affairs of the said corporation; and grant such other and further relief as the nature of the case may require.

On the 7th of November, 1887, the court appointed a receiver, and on the 8th William B. Preston, Robert T. Burton and John R. Winder, claiming to have an interest in a portion of the property, were made parties to the suit. Demurrers to the bill having been overruled, the defendants severally answered.

The corporation of the Church of Jesus Christ of Latter-Day Saints, in its answer, after stating the granting of its charter by an ordinance of the assembly of Deseret, and its confirmation by the legislature of the Territory of Utah, contended that this charter was a contract between the government and the persons accepting the grant, and those becoming corporators; and that the corporation had the power to hold real and personal property, without limit as to value and amount, for the purposes of its charter; that it never acquired property in its own name, but under the powers granted by the ordinance it did acquire and hold certain real and personal property, in the name of a trustee, in trust for said corporation; that the act of July 1st, 1862, expressly provided that existing vested

rights in real estate should not be impaired; that the defendant has ever been and still is a corporation or association for religious or charitable purposes; that so much of the act of Congress which took effect March 3, 1887, (referring to the act passed February 19, 1887,) as attempts to dissolve the defendant corporation, or to interfere with or limit its right to hold property, or to escheat the same, or to wind up its affairs, is unconstitutional and void; that the United States has not the power to do this, by reason of said contract; that when the act of March 3, 1887, took effect the said corporation, through its trustees, held and owned only three parcels of real estate, namely: 1st, all of block 87, in plat "A," Salt Lake City survey; 2d, part of block 88, plat "A," of said survey, containing $2\frac{157}{160}$ acres; 3d, part of lot 6, in block 75, plat "A," of same survey; that the defendant corporation had acquired the first two of these lots before July 1, 1862; that the first piece, namely, all of block 87, in plat "A," was, ever since 1850, and still is, used and occupied exclusively for purposes of the worship of God; that the third of said tracts, which is the only tract of land owned by the corporation on the 3d of March, 1887, which had been acquired subsequent to July 1, 1862, was always, and still is, used as a parsonage, necessary for the convenience and use of the corporation; that said corporation had owned other lands, but had sold and disposed of the same prior to March 3, 1887; that after the said act took effect, and in pursuance of section 26 of said act, it applied to the proper probate court for Salt Lake County for the appointment of three trustees to take the title to the three tracts above described; that on May 19, 1887, said court appointed William B. Preston, Robert T. Burton and John R. Winder such trustees; that afterwards said three tracts, except a part of lot 6, in block 75, (the third lot,) were conveyed to said trustees; that the remaining part of said lot 6 is now held by Theodore McKean, in trust for the defendant corporation, having been omitted from the conveyance to the said trustees by mistake; that said corporation does not now hold any real estate whatsoever; and that no successor to said John Taylor has ever been appointed trustee in trust by said corporation.

The answer denies that the charter and act of incorporation of the defendant was annulled by the act of February 19, 1887; and alleges that even if said act is valid and binding, it did not go into effect until March 3, 1887.

The answer further avers that prior to February 28th, 1887, the defendant corporation from time to time acquired and held personal property for charitable and religious purposes, and, on that day, held certain personal property donated to it by the members of the church and friends thereof solely for use and distribution for charitable and religious purposes, such property being always held by its trustee in trust; and that on the 28th of February, 1887, John Taylor, who then held all the personal property, moneys, stocks and bonds belonging to said corporation, as trustee in trust, with its consent and approval, donated, transferred and conveyed the same (after reserving sufficient to pay its then existing indebtedness) to certain ecclesiastical corporations created and existing under and by virtue of the laws of the Territory of Utah, to be devoted by them solely to charitable and religious uses and purposes, and delivered the same to them. Wherefore the defendant avers that when the act of March 3d, 1887, went into effect, it did not own or hold any personal property, except mere furniture, fixtures, and implements pertaining to its houses of worship and parsonage.

The defendants Wilford, Woodruff and others, charged as assistant trustees in the bill (except Moses Thatcher), deny that they ever were such assistant trustees, though they admit that they acted as counsellors and advisors of John Taylor, the trustee in trust. Thatcher admits that he was once elected assistant trustee, but alleges that his term of office expired the 9th of October, 1875, and he has never acted since. They all deny that they have ever owned or held any property belonging to the corporation. They all, however, adopt its answer.

Preston, Burton and Winder, who were made defendants after the suit was commenced, admit the conveyance to them of the three tracts described in the answer of the corporation, which they declare that they hold in trust for the Church of

Jesus Christ of Latter-Day Saints. They also adopt the answer of the corporation.

Replications were duly filed.

One Angus M. Cannon intervened as a claimant of certain coal lands supposed to be affected by the proceedings, and was admitted as a defendant, and filed an answer explaining his claim.

Several petitions were filed in the cause, with leave of the court, for the purpose of asking that certain pieces of property therein described might be set apart for the use of the church. They were:

1. A petition by Francis Armstrong, Jesse W. Fox, Jr., and Theodore McKean, who alleged that they held divers pieces of real estate (described in their petition) in trust for the use and benefit of the Church of Jesus Christ of Latter-Day Saints. To this petition the plaintiff filed a general replication.

2. William B. Preston, Robert T. Burton and John R. Winder filed a petition stating that they were duly appointed by the probate court of Salt Lake County trustees to hold title to real estate belonging to the said church, and as such trustees hold the legal title to certain pieces of land described, to wit: 1st, a piece known as the " Guardo house " and lot, held for the use and benefit of the president of the said church as a parsonage, where he has made his home and residence since 1878 ; 2dly, another piece adjoining the above known as the " Historian's Office " and grounds, the building on which contains the church, library and records, and the legal title to which is in Theodore McKean. The petitioners pray that the said premises be set apart to said church as a parsonage, and that the title be confirmed to the trustees.

To this petition the United States filed an answer, denying that said Preston, Burton and Winder hold the title to said " Guardo house " and land, or that they hold the same in trust for the said Church of Jesus Christ of Latter-Day Saints ; that the pretended conveyance under which they claim to hold the same is void and of no effect, for want of power in the grantors ; that said property has never been a parsonage ; and that the property designated as the historian's office and

grounds has never been part of any parsonage. On the contrary, the plaintiff avers that McKean holds the legal title to said property in trust for the late corporation of the Church of Jesus Christ of Latter-Day Saints as a part of its general property, and that the historian's office and grounds are entirely separate and apart from the Guardo house and lot, and in no manner connected therewith.

The said Preston, Burton and Winder filed another petition, stating their appointment as trustees as aforesaid, and that they, as such, hold another property described in the petition (being a portion of block 88, plat "A," of Salt Lake City survey) for the use and benefit of the said church, which was taken possession of by the agents of said church when Salt Lake City was first laid out in 1848, and ever since had been used and occupied by said church; and that prior to July 1, 1862, valuable buildings and improvements had been built thereon, still owned and possessed by the said church; and they pray that said property be set apart to said church, and the title and possession confirmed to the petitioners as trustees.

The United States filed an answer to this petition denying the truth of the same.

A similar petition was filed by the same parties, Preston, Burton and Winder, claiming to hold the legal title to block 87, plat "A," Salt Lake City survey, known as the "Temple Block" containing three large buildings constructed by said church exclusively for religious purposes, and which had been in its possession since 1848. They pray that this property may be set apart to the church, and the title and possession confirmed to the petitioners as trustees. The plaintiff, by answer, alleges that the conveyance under which the petitioners claim this property is also void for want of power in the grantors to convey.

Another petition was filed by George Romney, Henry Dinwoody, James Watson and John Clark, in behalf of themselves and of other members of the Church of Jesus Christ of Latter-Day Saints, alleging that said members are more than one hundred thousand in number, and so numerous that they cannot, without inconvenience and oppressive delays, be brought before the court; that they all have an interest in

common in the subject of the petition and the questions involved in this suit; that on the 7th of November, 1887, this court made an order appointing Frank H. Dyer receiver of the church aforesaid; that he, as such receiver, has seized, taken possession of, and now holds, subject to the order of the court, the following-described real and personal property, to wit:

1. All of block 87, plat "A," Salt Lake City survey, known as "Temple Block."

2. The east half of lot 6, block 75, plat "A," aforesaid, known as the "Guardo house" and grounds.

3. Part of lot 6, block 75, plat "A," aforesaid, known as the "Historian's office" and grounds.

4. A portion of block 88, plat "A," aforesaid, known as part of the "tithing-office" property.

5. The south half of lots 6 and 7, in block 88, plat "A," aforesaid, known as part of the "tithing-office" property.

6. Various tracts of land, designated, containing a large number of acres, situated in township 1 south, range 1 west, United States survey of Utah, and known as the church farm; excepting, however, a tract sold to the Denver and Rio Grande Western Railway Company by deed dated February 7, 1882.

7. The undivided half of the south half of the southeast quarter, the southeast quarter of the southwest quarter, and lot 4, section 18, and the north half of the northeast quarter of section 19, township 3 north, range 6 east, in Summit County, Utah Territory, known as coal lands.

Also a number of items of personal property, including 800 shares of stock in the Salt Lake Gas Company; 4732 shares in the Deseret Telegraph Company; several promissory notes of different parties and amounts; 30,158 sheep; $237,666.15 of money.

That since said personal property came into possession of the receiver he has collected rents on the real estate, and dividends on the gas stock; and that all the property in the possession of the receiver is of the aggregate value of about $750,000 exclusive of Temple Block.

That all of said property at the time so taken, and long prior thereto, was the property of the Church of Jesus Christ of

Latter-Day Saints, and that the possession of the receiver is wrongful and without authority or right.

That said church is a voluntary religious society, organized in the territory of Utah for religious and charitable purposes.

That said petitioners and others, for whose benefit they file the petition, are members of said church, residing in said Territory ; that the church became possessed of all of said property in accordance with its established rules and customs, by the voluntary contributions, donations and dedications of its members, to be held, managed and applied to the use and benefit of the church, for the maintenance of its religion and charities by trustees appointed by said members semi-annually at the general conference.

That John Taylor, the late trustee so appointed, died on the 25th day of July, 1887, and no trustee has been appointed since,

That the property in the hands of the trustees is claimed adversely to the church, the petitioners and the members thereof, and wholly without right, by the United States, and is wrongfully withheld by the receiver from the purposes to which it was dedicated and granted; that the petitioners and the members on whose behalf this petition is filed are equitably the owners of said property, and beneficially interested therein, and to prevent a diversion thereof from the religious and charitable purposes of the said church to which they donated and granted said property, the petitioners pray that in case said corporation of the Church of Jesus Christ of Latter-Day Saints should, upon the final hearing, be held and decreed to be dissolved, an order may be made decreeing:

1. That the said property belongs to the individual members of said church, and that they are authorized to appoint a trustee or trustees to hold, manage and apply such property to the purposes for which it was originally given. 2. That said receiver deliver the possession thereof to such trustee or trustees as may be named and appointed at a general conference of the members of the church, in accordance with its rules and customs.

To this petition the United States filed an answer, denying

the claim of the petitioners; admitting the appointment of the receiver, and his taking, possession of the property referred to; denying that at the time of such taking it was the property of the said Church of Jesus Christ of Latter-Day Saints, whether the petition is intended to apply to the late corporation or to the voluntary religious sect which has existed under that name since the dissolution of the said corporation. It admits that prior to the said dissolution said property belonged to the corporation of the Church of Jesus Christ of Latter-Day Saints, but alleges that since then it has had no legal owner except the United States ; denies that the said Church of Jesus Christ of Latter-Day Saints has been for years past a voluntary religious society or association, but alleges that up to the 19th day of February, 1887, said church existed as a corporation for religious purposes, and since that time, when it became dissolved, there has existed a voluntary and unincorporated religious society or sect, known by the name of the Church of Jesus Christ of Latter-Day Saints. It denies that the corporation to which all of said property belonged acquired the same by voluntary contributions, donations and dedications of the members thereof, and alleges that all of said realty was acquired by purchase, and that said personalty was acquired by said church largely by purchase and other means, as afterwards set out. It denies that the receiver is wrongfully withholding and diverting the property from the purposes to which it was donated, and denies that the petitioners or any other persons are equitably or otherwise the owners of said property or any portion thereof, or beneficially interested therein. The answer then sets forth the incorporation of the Church of Jesus Christ of Latter-Day Saints as a body for religious and charitable purposes, by the act of the Territorial Assembly of Utah in 1855, and avers that it continued to be a corporation up to the 19th of February, 1887; it then sets forth the act of Congress of July 1, 1862, before referred to, and the act of March 3, 1887, disapproving and annulling the act of incorporation aforesaid, and dissolving the said corporation, and alleges that it did become dissolved. It then states the previous proceedings

in the suit, and the appointment of a receiver, and alleges that the United States had filed in the District Court for the Third District of Utah a proceeding in the nature of an information against all the real property set out in the petition, for the purpose of having the same declared forfeited and escheated to the United States, which proceedings are now pending. And the answer alleges that said real property has become forfeited to the United States, as shown in said information. The answer further states that the said corporation was a religious corporation for the purpose of promulgating, spreading and upholding the principles, practices, teachings and tenets of said church, and that it never had any other corporate objects, purposes or authority; never had any capital stock or stockholders, nor persons pecuniarily interested in its property, nor any natural persons authorized to take or hold any personal property or estate for said corporation, except such trustees as were provided for by its statute of incorporation, and that the power of appointing such trustees ceased and became extinct at the date of its dissolution; that up to that date said personal property had been used for and devoted exclusively to the promulgation, spread and maintenance of the principles, practices, teachings and tenets of said Church of Jesus Christ of Latter-Day Saints, amongst which the doctrine and practice of polygamy, or plurality of wives, was a fundamental and essential doctrine, tenet and principle of said church, and the same was opposed and contrary to good morals, public policy and the laws of the United States, and that the use made of said personal property was largely for purposes of upholding and maintaining said doctrine and practice of polygamy, and violating the laws of the United States; that since said dissolution there has existed a voluntary and unincorporated sect known as the Church of Jesus Christ of Latter-Day Saints, comprising the great body of individuals named in said intervention, who formerly formed the membership of the said corporation; that the organization and general government of said voluntary religious sect, and its principles, doctrines, teachings and tenets include the practice of polygamy, and have been substantially the same as

those of the said corporation; that the said voluntary religious sect has upheld and maintained the unlawful and immoral practice and doctrine of polygamy as strongly as the said corporation did; and that any uses, purposes or trusts to which said personal property could be devoted in accordance with the original purposes and trusts to which it was dedicated would be opposed to good morals and public policy, and contrary to the laws of the United States. The answer further states that there are no natural persons or corporations entitled to any portion of the personal property thereof, as successors in interest to said corporation; that all definite and legal trusts to which said property was dedicated have totally failed and become extinct; and that by operation of law the said property has become escheated to the United States; that the allegation that said property was acquired by voluntary contributions, donations and dedications of the members of the corporation is not true, but that the late corporation carried on business to a wide extent, and whilst a large amount of personalty in the shape of tithes was paid to the church each year by the members thereof, yet the personalty now in the hands of the said receiver is in no part made up of voluntary contributions or tithes paid in as aforesaid, but is all of it property which was acquired by said corporation in the course of trade, by purchase, and for a valuable consideration; and it held the same in its corporate capacity, absolutely and entirely independent of any individual members of said corporation, and upon the trust and for the uses and purposes set out, which, as has been alleged, were in whole or in part immoral and illegal.

A replication was filed to this answer.

The last-mentioned petition of intervention and the answer thereto are in the nature of an original bill and answer, but serve to present the whole controversy in all its aspects, and for that purpose may properly be retained, as no objection is made thereto.

The cause came on to be heard upon the pleadings, proofs and an agreed statement of the facts. The court made a finding of facts, upon which a final decree was rendered. The facts found are as follows:

"1st. That the Church of Jesus Christ of Latter-Day Saints was, from the 19th day of January, 1855, to the 3d day of March, A.D. 1887, a corporation for religious and charitable purposes, duly organized and existing under and in pursuance of an ordinance enacted by the legislature of the Territory of Utah, and approved by the governor thereof on the said 19th day of January, A.D. 1855, a copy of which ordinance is made a part of the complaint herein.

"2. That on the 19th day of February, A.D. 1887, the Congress of the United States passed an act entitled 'An act to amend section 5352 of the Revised Statutes of the United States in reference to bigamy, and for other purposes,' approved March 22d, 1882, which purported to disapprove, repeal and annul the said charter and act of incorporation of the corporation of the Church of Jesus Christ of Latter-Day Saints aforesaid and passed as aforesaid.

"3. That immediately before the passage of said act of Congress of February 19th, 1887, the said John Taylor was, and for a long time prior thereto had been, the qualified and acting trustee in trust of said corporation of the Church of Jesus Christ of Latter-Day Saints; that after the passage of said act of Congress of February 19th, 1887, the said John Taylor claimed to hold and continued to exercise the powers conferred upon said Church of Jesus Christ of Latter-Day Saints by said act of incorporation until his death, which occurred on the 25th day of July, A.D. 1887.

"4. That at the date of the passage of said act of Congress of February 19th, A.D. 1887, and for a long time prior thereto, there were no assistant trustees of said corporation, none having been elected, appointed or qualified since the year 1887; that said Wilford Woodruff, Lorenzo Snow, Erastus Snow, Franklin D. Richards, Brigham Young, Moses Thatcher, Francis M. Lyman, John Henry Smith, George Teasdale, Heber J. Grant and John W. Taylor were, at the commencement of this suit, counsellors and advisers of the said John Taylor, and continued to his death counselling and advising him respecting the management, use and control of the property hereinafter described.

" 5. That since the passage of said act of Congress of February 19, 1887, the Church of Jesus Christ of Latter-Day Saints has existed as a voluntary religious sect, of which the said Wilford Woodruff is the acting president, and it has had duly designated and appointed by the Probate Court of Salt Lake County, in said Territory, in pursuance of the act of Congress aforesaid, the following-named trustees, William B. Preston, Robert T. Burton and John R. Winder, to take the title to and hold such real estate as shall be allowed said religious sect by law for the erection and use of houses of worship, parsonages and burial grounds.

" 6. That at the time of the passage of said act of Congress of February 19, 1887, there were no outstanding debts of or claims against said corporation, so far as appears to the court from the evidence herein.

" 7. That at the time of the passage of the act of Congress of February 19, 1887, the said corporation owned, held, and possessed the following real estate in said Territory, to wit."

The items of real estate were then enumerated, being substantially the same as those specified in the petition of George Romney and others, before referred to, with the addition of the valuation of each item or piece of property; the Temple Block being valued at $500,000; the Guardo house and grounds at $50,000; the Historian's office and grounds at $20,000; the Tithing-office and grounds, one portion at $50,000, and the other at $25,000; the Church farm at $110,000; and the seventh item, known as " coal lands in Summit County," valued at $30,000.

The court further found as follows:

" The legal title to the real estate, first above described, known as the Temple Block, at the time said act of February 19, 1887, went into effect was in John Taylor, as trustee in trust for the said corporation, which said trustee in trust subsequently and on the 30th day of June, 1887, attempted to convey the same to William B. Preston, Robert T. Burton and John R. Winder, as trustees, by a certain instrument in writing in the words and figures following, to wit:

" ' This indenture, made on this thirtieth day of June, in the

year of our Lord one thousand eight hundred and eighty-seven, by and between John Taylor, trustee in trust of that certain body of religious worshippers called and known as the Church of Jesus Christ of Latter-Day Saints, party of the first part, and William B. Preston, presiding bishop of said church, and his two counsellors, Robert T. Burton and John R. Winder, parties of the second part.'"

The indenture then recites the appointment of the parties of the second part, by probate court of Salt Lake County, as trustees to hold certain real property of the said church located in Salt Lake City, under and in pursuance of the 26th section of the act of March 3, 1887, and purports on the part of Taylor, the party of the first part, in consideration of one dollar, to convey to the parties of the second part and their successors duly appointed, upon trust, the property referred to, being all of block 87 in plat " A," Salt Lake City survey, for the use, benefit and behoof of that body of religious worshippers known and called the Church of Jesus Christ of Latter-Day Saints, and for such use as said church or its authorities should dictate and appoint, with provision for the devolution of the property in case of failure of the trustees.

The court further found as follows:

"The said Temple Block was taken possession of by the agents of the said Church of Jesus Christ of Latter-Day Saints, then existing as a voluntary unincorporated religious sect, when Salt Lake City was first laid out and surveyed, in 1848, and since said date has been in possession of said church as a voluntary religious sect until it became incorporated as aforesaid, and then as a corporation; that at the time the same was taken possession of as aforesaid it was a part of the public domain and continued to be such until said land was entered by the mayor of said city, along with other lands, on the 21st day of November, 1871, under the town-site act of Congress entitled 'An act for the relief of cities and towns upon the public lands,' approved March 2, 1867; that on the 1st day of June, 1872, the same was conveyed by the mayor of said Salt Lake City to the trustee in trust of said corporation, in whom the title remained until the act of Congress of February 19, 1887, took effect. ..

"The facts in regard to the possession and acquisition of the balance of said real estate above described are as follows : The second property, above described and known as the Guardo house and grounds, was owned by Brigham Young individually at the time of his death, in 1877, and was thereafter transferred and conveyed by his executors to John Taylor, as trustee in trust for the corporation of the Church of Jesus Christ of Latter-Day Saints, for a valuable consideration, pursuant to the powers in them vested by the will of the said Brigham Young; that subsequently, on the 24th day of April, 1878, the said John Taylor, as trustee in trust, transferred and conveyed the same to Theodore McKean on a secret trust for said corporation, who held the same upon said trust until the 2d day of July, 1887, when he attempted to convey the same to William B. Preston and Robert T. Burton and John R. Winder, trustees, by a certain instrument in writing, of which the following is a copy."

The deed is then set out in the findings, and is altogether similar to that executed by John Taylor to Preston, Burton and Winder, before recited.

The court further found as follows:

"That said Guardo house and grounds were used and occupied by said John Taylor, president of said church, from 1878 up to the time of his death as a residence.

"The third property above described, known as the historian's office and grounds, was taken possession of by Albert T. Rockwood in 1848, and was a part of the public domain, and continued to be such up to the 21st day of November, 1871, when the town site of Salt Lake City was entered as aforesaid; that on the 3d day of October, 1855, the Church of Jesus Christ of Latter-Day Saints, through its trustee in trust, Brigham Young, purchased the said Rockwood's claim to said premises and at its own cost and expense erected thereon the building which has ever since been known as the historian's office and residence; that said building was large enough to accommodate the historian's family and furnish an office for the church historian; that from the year 1848 until the time of his death in 1875, George A. Smith was the historian of

said church and lived in said building with his family and had the custody of the books, papers and records of said church relating to its history or public acts of its officers and members; that the same have always been kept in said building from the time of its construction until the present time, at the cost of said church, and that such office is and has been necessary for the use of said historian in the discharge of his duties; that in 1872 the said George A. Smith obtained the title to said premises from the mayor of Salt Lake City under the town-site act, and that after his death the same was conveyed to his wife and one of his granddaughters, who afterwards transferred and conveyed the same to Theodore McKean for a valuable consideration; that the said Theodore McKean has ever since that date held and now holds the same on a secret trust for the use and benefit of said corporation; that said grounds are immediately west of and adjoining the Guardo-house grounds.

"The fourth property above described, known as part of the tithing office and grounds, was taken possession of by the agents of the Church of Jesus Christ of Latter-Day Saints when Salt Lake City was first laid out and surveyed, in 1848, and ever since that time has been used and occupied by said church as a voluntary sect until it became incorporated as aforesaid, and then as a corporation, receiving and disbursing tithing and voluntary contributions of property, and that prior to July 1, 1862, buildings and other improvements of considerable value had been built thereon by said church; that at the time said property was taken possession of as aforesaid it was a part of the public domain and continued to be such until the 21st day of November, 1871, when said land was entered as aforesaid along with other lands under said town-site act by the mayor of Salt Lake City; that Brigham Young, who was then president and trustee in trust of said corporation, claimed said land under said town-site law and it was conveyed to him by Daniel H. Wells, mayor of Salt Lake City; that in November, 1873, Brigham Young transferred and conveyed said property to George A. Smith, as the trustee in trust of the corporation of the Church of Jesus Christ of Latter-Day Saints, and his successor in office; that on the death of said George A. Smith

the legal title in said premises vested in Brigham Young as such successor, and the executors of said Brigham Young transferred and conveyed said property to John Taylor, as the trustee in trust of said corporation, who, in April, 1878, transferred and conveyed the same to Edward Hunter upon a secret trust for the use and benefit of said corporation; that said Edward Hunter afterwards, to wit, on the 24th day of April, 1878, transferred and conveyed the same to Robert T. Burton on a secret trust for said corporation, and on the 2d day of July, 1887, the said Robert T. Burton attempted to convey the same to William B. Preston, John R. Winder, and himself, as trustees, by a certain instrument in writing in the words and figures following, to wit."

The deed here copied is similar to the previous deeds before recited.

The court further found as follows:

"The fifth piece of property above described, known as a part of the tithing office and grounds, was possessed, acquired and owned as follows:

"In the year 1848, Newell K. Whitney, then presiding bishop of said Church of Jesus Christ of Latter-Day Saints, took possession of lot five, block eighty-eight, plat 'A,' Salt Lake City survey, and in the same year Horace K. Whitney took possession of lot six, in said block; that some time in the year 1856 the Church of Jesus Christ of Latter-Day Saints, by its agents, took possession of the south half of said lots and placed thereon yards and corrals, and have continued to occupy the same with said yards and corrals down to this period; that in the year 1870 the mayor of Salt Lake City entered the town site of Salt Lake City, in trust for the inhabitants and occupants thereof, under the law of 1867; that the foregoing lots are a portion of said entry.

"The said Church of Jesus Christ of Latter-Day Saints, by its trustee, Brigham Young, filed an application in the proper court for a title to the south half of said lots, and the heirs of Newell K. Whitney also filed an application in the proper court for the south half of lot five, and Horace K. Whitney filed an application in the same court for the south half of lot

six. The court awarded the title to the said premises to Brigham Young, as trustee as aforesaid.

"That afterwards, in the year 1872, Brigham Young, trustee, obtained a deed from the heirs of Newell K. Whitney to said south half of lot five, and in consideration thereof paid them seven thousand dollars, and at the same time the said Brigham Young, trustee, obtained a deed from Horace K. Whitney of lot six, and paid him therefor the sum of two thousand dollars.

"At the time the act of Congress of February 19, 1887, took effect the legal title thereto was held by Robert T. Burton on a secret trust for the use and benefit of said corporation ; that on the 2d day of July, 1887, the said Robert T. Burton attempted to convey the same to Wm. B. Preston, John R. Winder, and himself as trustees, by that certain instrument of writing hereinbefore last set out.

"The remainder of said real estate held, owned and possessed by said corporation as aforesaid was acquired by it after the first day of July, 1862, by purchase, but the legal title thereof was at all times held by persons in trust for said corporation upon secret trusts, and not by the corporation itself.

"That at the time the said act of Congress of February 19, 1887, took effect said corporation owned, held and possessed the following-described personal property; to wit."

The items of personal property are then set out, being the same as in the petition of Romney and others before referred to.

The court further found as follows :

"That the said corporation of the Church of Jesus Christ of Latter-Day Saints was in its nature and by its statute of incorporation a religious and charitable corporation for the purpose of promulgating, spreading and upholding the principles, practices, teachings and tenets of said church, and for the purpose of dispensing charity, subject and according to said principles, practices, teachings and tenets, and that from the time of the organization of said corporation up to the time of the passage of said act of February the 19th, 1887, it never had any other corporate objects, purposes and authority ; never

had any capital stock or stockholders, nor have there ever been any natural persons who were authorized under its act and charter of incorporation to take or hold any personal property or estate of said corporation, except the trustees provided for by said statute of incorporation.

"That the said personal property hereinbefore set out had been accumulated by said late corporation prior to the passage of said act of February the 19th, 1887, and that such accumulation extended over a period of twenty years or more; that prior to and at the time of the passage of said act the said personal property had been used for and devoted to the promulgation, spread and maintenance of the doctrines, teachings, tenets and practices of the said Church of Jesus Christ of Latter-Day Saints, and the doctrine of polygamy or plurality of wives was one of the said doctrines, teachings, tenets and practices of the said late church corporation, but only a portion of the members of said corporation, not exceeding twenty per cent of the marriageable members, male and female, were engaged in the actual practice of polygamy; that since the passage of the said act of Congress of February 19, 1887, the said voluntary religious sect known as the Church of Jesus Christ of Latter-Day Saints has comprised the great body of individuals who formerly composed the membership of said corporation, and the organization, general government, doctrines and tenets of said voluntary religious sect have been and now are substantially the same as those of the late corporation of the Church of Jesus Christ of Latter-Day Saints.

"That certain of the officers of said religious sect, regularly ordained, and certain public preachers and teachers of said religious sect, who are in good standing, and who are preachers and teachers concerning the doctrines and tenets of said sect, have, since the passage of said act of Congress of February the 19th, 1887, promulgated, taught, spread and upheld the same doctrines, tenets and practices, including the doctrine of polygamy, as were formerly promulgated, taught and upheld by the said late corporation, and the said teachings of the said officers, preachers and teachers have not been repudiated or dissented from by said voluntary religious sect, nor have their

teachings and preachings or their actions created any division or schism in said voluntary religious sect.

"That any dedication or setting aside of any of the per-sonal property hereinbefore set out as having belonged to the late corporation, to the uses and purposes of or in trust for the members of the late corporation of the Church of Jesus Christ of Latter-Day Saints, or any of them, would practically and in effect be a dedication and setting aside of said personal property to the uses and for the purposes of and in trust for the unincorporated religious sect known as the Church of Jesus Christ of Latter-Day Saints.

"That at the commencement of this suit all of said personal property was in the possession of the said William B. Preston, who held it in trust and for the benefit of said corporation.

"That all of the above described property, real and per-sonal, is now in the possession of Frank H. Dyer, receiver of this court.

"That of the above-described real estate the following tract, including the buildings thereon, situated in said county of Salt Lake, Territory of Utah, and being all of block eighty-seven (87), in plat 'A,' Salt Lake City survey, at the time of the passage of the act of Congress of February 19, 1887, was used exclusively for the worship of God according to the doctrines and tenets of the Church of Jesus Christ of Latter-Day Saints.

"That several proceedings have been instituted by and with the consent and advice of this court, by information, on behalf of the United States of America, in the Third District Court of said Territory of Utah, for the purpose of having declared and adjudged forfeited and escheated to the government of the United States all of the above-described real estate, except-ing the said block eighty-seven of plat 'A,' Salt Lake City survey, last above mentioned, by virtue of the said act of Con-gress entitled 'An act to amend section 5352 of the Revised Statutes of the United States in reference to bigamy, and for other purposes,' which proceedings are now pending in said court and undetermined."

Upon this finding of facts the court adjudged and decreed as follows, to wit:

"That on the 3d day of March, 1887, the corporation of the. Church of Jesus Christ of Latter-Day Saints became and the same was dissolved, and that since said date it has had no legal corporate existence.

"2d. It is furthermore adjudged and decreed that the following alleged deeds, hereinbefore set out, were executed without authority, and that no estate in the property set out in said deeds passed by the same or any of them, to wit;

"The deed, dated June 30th, 1887, from John Taylor, trustee in trust, to William B. Preston, Robert T. Burton and John R. Winder, as trustees, for the property described as the 'Temple Block.' The deed, dated July 2d, 1887, from Theodore McKean and his wife to William B. Preston, Robert T. Burton and John R. Winder, as trustees, for property known as the 'Guardo house' and grounds. The deed, dated July 2d, 1887, from Robert T. Burton and wife to William B. Preston, Robert T. Burton and John R. Winder, as trustees, for the property described as the 'Tithing house' and grounds.

"And it is therefore ordered and decreed that said alleged deeds and each of them be, and the same are hereby, annulled, cancelled and set aside.

"3d. It is further adjudged and decreed that the following-described real estate, to wit, all of block eighty-seven, in plat 'A,' Salt Lake City survey, in the city and county of Salt Lake, Territory of Utah, be, and the same is hereby, set apart to the voluntary religious worshippers and unincorporated sect and body known as the Church of Jesus Christ of Latter-Day Saints, and that the said William B. Preston, Robert T. Burton and John R. Winder, trustees appointed by the Probate Court of Salt Lake County, as hereinbefore set out, do hold, manage and control said property so set aside for the benefit of said voluntary religious worshippers and unincorporated sect and body, and for the erection and use by them of houses of worship, and for their use and convenience in the lawful exercise of worship according to the tenets of said sect and body; and it is ordered that Frank H. Dyer, receiver of this court, heretofore appointed, do surrender and deliver possession and control of all of the property so set aside to the trustees,

William B. Preston, Robert T. Burton and John R. Winder, aforesaid.

"4th. It is furthermore adjudged and decreed that, except as to the Temple block aforesaid, the petitions of William B. Preston, Robert T. Burton and John R. Winder, trustees, filed the 6th day of October, 1888, in this court for the setting aside of certain real estate for the uses and purposes of the religious sect known as the Church of Jesus Christ of Latter-Day Saints be, and the same are hereby, denied; and it is adjudged and decreed that the balance of the real estate over and above said Temple block, which has been hereinbefore found as belonging to said late corporation, has not nor has any of it ever been used as buildings or grounds appurtenant thereunto for the purposes of the worship of God or of parsonages connected therewith, or for burial grounds by the said late corporation of the Church of Jesus Christ of Latter-Day Saints, nor is the said real estate, except as set aside, or any part thereof, necessary for such purposes for the unincorporated religious sect known as the Church of Jesus Christ of Latter-Day Saints.

"5th. It is furthermore adjudged and decreed that all of the real estate set out in the findings of fact hereinbefore was the property of and belonged to the late corporation of the Church of Jesus Christ of Latter-Day Saints, and the same was held in trust for said corporation; and, furthermore, that the legal titles of and estates in said real estate and every part and parcel thereof were acquired by said late corporation and its trustees subsequently to July 1, 1862, and that prior to said date neither the said corporation nor its trustees had any legal title or estate in and to said real estate or any part thereof.

"6th. And it is further adjudged and decreed that the petition of intervention by George Romney, Henry Dinwoody, James Watson and John Clark, on behalf of themselves and other members of the late corporation of the Church of Jesus Christ of Latter-Day Saints, filed this day in this court, which said petition alleges the claim on behalf of the petitioners and those for whom it is filed in and to the real and personal property formerly belonging to said late corporation and now

in the hands of the receiver of this court be, and the same is hereby, denied; and it is adjudged and decreed that neither said interveners nor those in whose behalf they filed said petition have any legal claim or title in and to said property or any part thereof.

"7th. And the court does further adjudge and decree that the late corporation of the Church of Jesus Christ of Latter-Day Saints having become by law dissolved as aforesaid, there did not exist at its dissolution and do not now exist any trusts or purposes within the objects and purposes for which said personal property was originally acquired, as hereinbefore set out, whether said acquisition was by purchase or donation, to or for which said personalty or any part thereof could be used or to which it could be dedicated, that were and are not in whole or in part opposed to public policy, good morals and contrary to the laws of the United States; and, furthermore, that there do not exist any natural persons or any body, association or corporation who are legally entitled to any portion of said personalty as successors in interest to said Church of Jesus Christ of Latter-Day Saints, nor have there been nor are there now any trusts of a definite and legal character upon which this court, sitting as a court of chancery, can administer the personal property hereinbefore set out; and it is furthermore adjudged that all and entire the personal property set out in this decree as having belonged to said late corporation of the Church of Jesus Christ of Latter-Day Saints has by reason of the dissolution of said corporation as aforesaid, on account of the failure or illegality of the trusts to which it was dedicated at its acquisition and for which it had been used by said late corporation and by operation of law, become escheated to and the property of the United States of America, subject to the costs and expenses of this proceeding and of the receivership by this court instituted and ordered.

"8th. It is furthermore ordered and adjudged that there is not now and has not been since the 3d day of March, 1887, any person legally authorized to take charge of, manage, preserve and control the personal and real property hereinbefore set out, except the receiver heretofore appointed by this court;

and it is therefore ordered that the receivership hereinbefore established by this court is continued in full force and effect, and that the said receiver shall continue to exercise all and entire the powers and authority conferred upon him by the decree appointing him; and it is further ordered that he do continue in his possession and keeping all of the property, real and personal, hereinbefore set out, except such realty as has been set apart by the provision of this decree for the benefit of the unincorporated religious sect known as the Church of Jesus Christ of Latter-Day Saints, and that he do safely keep, manage and control the same in accordance with the provisions of the order of this court appointing him receiver, pending the determination of the proceeding upon information hereinbefore referred to and until the further order of this court; and final action upon and determination concerning the accounts, proceedings and transactions of said receiver and all matters connected with or incidental thereto are ordered to be reserved for the future consideration and decision of this court."

From this decree the defendants appealed, and the interveners, Romney and others, also took a separate appeal, and the case is now here for adjudication.

*Mr. James O. Broadhead* (with whom was *Mr. Franklin S. Richards* on the brief) for appellants.

It is settled law that the people of the United States represented by Congress, may do for the Territories what the people of each State may do for their State. But the same authority has established the doctrine that the personal and civil rights of the inhabitants of the Territories are secured to them by the same principles of constitutional liberty which restrain all the agencies of government, state and national, and that therefore the Congress of the United States has no right to impair the safeguards which protect the civil rights of every citizen, whether in a State or a Territory, and which are secured to him by the express provisions of the Constitution of the United States, or by the principles of government which underlie our whole political system. And it is equally well established by

the decisions of this court that Congress can pass no law impairing the obligation of contracts, or legislating back to the government property that has been given away by acts. of Congress, or divesting title of property from one citizen and giving it to another, because such acts are repugnant to the spirit of our institutions.

In the exercise of its unquestioned power the territorial legislature of Utah, in 1851, by joint resolution, approved the charter of this corporation, which had been previously granted by the so-called State of Deseret, and on the 19th day of January, 1855, it confirmed and reënacted the same. The franchises granted to this corporation were that it should be a corporation with perpetual succession, and with power to acquire and hold real and personal estate for the religious and charitable purposes set forth in the charter. No authority was given to the church by this charter, nor is it claimed in its organization that any authority exists, to set at defiance the laws of the land, nor is it claimed, as has been asserted by the Supreme Court of Utah in the opinion delivered by that court in this case, that the organization claims to be directed and led by inspiration that is above all human wisdom and subject to a power above all municipal governments. The court claims this assertion of fact as belonging to history, whereas the very contrary doctrine is asserted in what are called the "revelations" of this church, to be found on page 219 of their book of Doctrine and Covenants. The one distinguishing feature of this corporation is, that, being a corporation founded for religious and charitable purposes it was not founded for the profit of the corporators, but for the administration of charitable trusts. It is with regard to a corporation of this character that we maintain that:

I. Congress having, by the organic act of September 9, 1850, given full power and authority to the Territory of Utah over all rightful subjects of legislation, including the power and authority to create private corporations, and no right to repeal, alter or amend the powers and franchises vested in the church corporation having been reserved in the act of incorporation, or in any other act or law of the territorial legisla-

ture of Utah, or in the organic act itself, the creation of this corporation was a contract which could not be altered or repealed by any subsequent act of the territorial legislature or of the Congress of the United States.

While we admit that the Congress of the United States has supreme legislative authority over the Territories, we maintain that it has not the power to undo what it authorized to be done. We say that while the granting of a corporate franchise is an act of legislation — a law, because it is an act of the law-making power, the only representative of the State in this respect — it is something more than a law in the general sense of that word. A law in its general sense is a rule of action, and applies to every citizen in the community. An act of incorporation, or any other contract made by the authorities representing the State, applies to one individual, or to a limited number of individuals; and while it is a law, as applied to them, it is at the same time a contract made with them, which, if executed, may not be impaired by any subsequent act of legislation. If there is a provision in the charter that it may be repealed by the power granting it — that the artificial person created by the act may be destroyed — then this power of repeal becomes a part of the contract, or if by a general law relating to the subject of corporations it is declared substantially that their charters may be amended, and that the State reserves the right to alter or repeal them, then this reservation becomes a part of the contract. *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 637, 645, 682, 700.

The reservation contained in the organic act of the Territory of the right to disapprove acts passed by the territorial legislature is not a reservation upon all the grants of power contained in that section of the organic act, or rather in that part of the section which gives them the right to legislate upon all rightful subjects of legislation. There is nothing in the organic act, nor in the charter under consideration, nor in any act of Congress, which reserves to Congress or to the territorial legislature the right to alter, amend or repeal a charter of incorporation. Every decision of this court in which the right of a legislature to alter or take away the franchises

of a corporation has been upheld is a case in which there was either a special reservation in the charter, or some provision of a general law on the subject of corporations, reserving to the State the power to alter or repeal the act creating the corporation. *Miller* v. *State*, 15 Wall. 478, 488; *Greenwood* v. *Freight Company*, 105 U. S. 13, 15; *Pennsylvania College Cases*, 13 Wall. 190, 212; *Terrett* v. *Taylor*, 9 Cranch, 43, 53; *Wilkinson* v. *Leland*, 2 Pet. 627, 657; *Osborn* v. *Nicholson*, 13 Wall. 654; *Calder* v. *Bull*, 3 Dall. 386, 388; *Dred Scott* v. *Sandford*, 19 How. 393, 449.

II. The charter of the church corporation received the implied sanction of Congress, and thereafter Congress could not impair the contract nor dissolve the corporation, either by disapproving the act of incorporation, or by repealing the charter.

The law requires that the secretary of the Territory shall transmit to the President of the Senate and to the Speaker of the House of Representatives, for the use of Congress, two copies of the laws and journals of each session of the territorial legislature, within thirty days after the end of each session, and one copy to the President of the United States. This court will presume that the officers have performed their duty in this respect. From 1851 to 1887 there were thirty-six regular sessions of Congress. The sixth section of the organic act provides that all laws passed by the Legislative Assembly and Governor shall be submitted to the Congress of the United States, and if disapproved shall be null and of no effect. It is true there is no time fixed within which this disapproval may be manifested, but after this long period of time it is certainly fair to presume that such legislation has received the implied sanction of Congress. *Clinton* v. *Englebrecht*, 13 Wall. 434, 446.

But if it should be held that Congress had the power to disapprove the charter of the church and dissolve the corporation, then the property now in possession of the receiver would belong to the members of the corporation, and it should have been set apart, by the court below, for their use and benefit. In the well considered opinion of the Court of Ap-

peals in New York in the case of *People* v. *O'Brien*, 111
N. Y. 2, it is said : " It cannot be necessary at this day to enter
upon a discussion in denial of the right of the government
to take from either individuals or corporations any property
which they may rightfully have acquired.   In the most arbi-
trary times such an act was recognized as pure tyranny, and
it has been forbidden in England ever since *Magna Charta*,
and in this country always.   It is immaterial in what way the
property was lawfully acquired, whether by labor in the ordi-
nary avocations of life, by gift, or descent, or by making a
profitable use of a franchise granted by the State ; it is enough
that it has become private property, and it is thus protected
by the law of the land."

To the same effect is the language of this court in *Green-
wood* v. *Freight Co.*, *ubi sup.*, where it is said : " Personal and
real property acquired by the corporation during its lawful
existence, rights of contract, or choses in action so acquired,
and which do not in their nature depend upon the general
powers conferred by the charter, are not destroyed by such a
repeal; and the courts may, if the legislature does not pro-
vide some special remedy, enforce such rights by the means
within their power.   The rights of the shareholders of such a
corporation, to their interest in its property, are not annihi-
lated by such a repeal, and there must remain in the courts
the power to protect those rights."  p. 19.

The act of March 3, 1887, was an act of judicial legislation,
and for this reason beyond the power of the legislative depart-
ment of the general government; it is, therefore, unconstitu-
tional.  *Hurtado* v. *California*, 110 U. S. 516, 535 ; *Davis* v.
*Gray*, 16 Wall. 203, 223 ; *Pennsylvania College Cases*, 13
Wall. 190, 212 ; *Terrett* v. *Taylor*, *ubi sup.*; *Loan Association*
v. *Topeka*, 20 Wall. 655, 662.

The act of Congress of March 3, 1887, not only purports to
disapprove the territorial act incorporating the church, but it
also decrees the dissolution of the corporation and confiscates
its property.

What has been said in regard to the power of Congress to
annul the charter of incorporation of the Church of Jesus

Christ of Latter-Day Saints applies to the act of July 1, 1862, and of March 3, 1887. In regard to the act of March 3, 1887, it may be further said that it was an act of judicial legislation, even if it were a lawful act, so far as the mere disapproval of the act of incorporation is concerned.

The Congress of the United States is not content with dissolving the corporation and leaving the rights of property belonging to the corporation at the time of its dissolution to be determined by existing laws, but it makes, or undertakes to make, a new law in the nature of a judicial determination to the effect that this property no longer belongs to the corporation, nor to the individual members who composed the corporation, but that it belongs to the United States, and that the court will set apart so much as in its judgment shall be necessary for the convenience and use of the congregation, or the members composing the congregation, and that the balance shall be disposed of conformably to some law not pointed out in the act, but which the Congress of the United States assumes to have an existence, fixing rules for the disposition of such property.

The court, in its final judgment, adjudged the personal property escheated; set aside part of the real estate; and authorized the remainder to be proceeded against by information. It is difficult to understand why the realty was not escheated as well as the personalty. There was as much authority to do the one as the other; and there was no legal authority to do either.

IV. There is no such thing known to the jurisprudence of the United States as escheat. There is no rule of law by which personal property of any kind can escheat to the United States.

Under the laws of the United States, property may become subject to forfeiture under the provisions of various statutes, but no forfeiture can exist except by statutory provision. The doctrine of escheat belongs to the common law which was varied from time to time by acts of Parliament. "Escheats," said Lord Coke, "are of two kinds; First, *propter defectum tenentis ;* second, *propter delictum tenentis.*" See Coke Lytt. 13 a, 92 b.

The doctrine, as applied to real estates in England, is that where a person dies intestate, without leaving any person who, according to the law of inheritance, can claim as heir, the estate in fee will escheat to the lord from whom the fee is held. And, as this doctrine was derived partly from the feudal system, things which do not lie in tenure as a rent charge will not escheat; and at common law an equitable or trust estate would not be forfeited or escheated either for treason or felony, for the simple reason that there is a trustee in possession; and if there be a tenant, no matter whether he holds for himself or in trust for some one else, the reasons which would cause an escheat to the lord would not in that case exist. See *Attorney General* v. *Sands*, Tudor's Leading Cases, 775 and notes, 3d Eng. ed.

If lands be given to a body corporate or politic, as for instance to a dean and chapter, or to a mayor and commonalty and to their successors, upon its dissolution the land will revert to the donor and not to the lord by escheat. Coke Lytt. 13 b.

Equitable estates and estates held in trust are not liable to escheat, because they are not the subject of tenure and because the lord can only claim the escheat on account of the defect of the tenant. *Cox* v. *Parker*, 22 Beavan, 168; *Burgess* v. *Wheate*, 1 Eden, 128, 176; *Taylor* v. *Haygarth*, 14 Sim. 8, 16; *Beale* v. *Symonds*, 16 Beavan, 406.

At common law, the crown, by virtue of its prerogative, is entitled to chattels, real or personal, of an intestate leaving no next of kin. Tudor's Leading Cases, 784 and notes; *but this does not apply to equitable estates or the property of dissolved religious corporations.*

Personal estate was formerly forfeited to the crown upon conviction of treason or felony. *McDowell* v. *Bergen*, 12 Irish Com. Law (N. S.) 391; Hawkins's Pleas of the Crown, book 2, c. 49, sec. 9.

But the harsh rules of the common law in regard to escheats and forfeitures were abolished in cases of treason or felony by Statutes 33 and 34 Vict. c. 23.

In the statutes of most of the States of the Union there

are laws regulating escheat; and in most of those States — all of them indeed except the State of Louisiana — the common law, and the acts of Parliament of a general nature prior to the fourth year of the reign of James I, have been adopted, but the common law has never been adopted by the United States. *Wheaton* v. *Peters,* 8 Pet. 591.

V. The personal property is not subject to escheat to the United States on account of any failure or illegality of the trusts to which it was dedicated at its acquisition and for which it has been used by the corporation.

There is no rule of equity jurisprudence which authorizes a chancellor to declare as forfeited or escheated to the government, property which has been used for an illegal or immoral purpose. Courts of equity will refuse to carry into effect illegal or immoral contracts. Of this there are numerous instances, but we know of no case in which a court of equity, in the absence of any statutory provision on the subject, has been authorized to escheat or forfeit to the government, property which has been illegally acquired, or which is held for illegal or immoral purposes. . By the provisions of the statutes of some of the States, courts of equity, at the instance of an escheator, an officer appointed to prosecute on behalf of the Commonwealth in such cases, will entertain jurisdiction of escheats. But even where this is provided by positive law, the doctrine of escheats will be avoided by courts of equity in the interests of justice, by the application of the doctrine of equitable conversion. *Commonwealth* v. *Martin,* 5 Munford, 117.

VI. If both the acts of Congress referred to should be held constitutional and valid, and it should be declared that any real estate belonging to the corporation can be legally forfeited and escheated to the United States by any legal proceedings, then we claim that the following described real estate cannot be held as forfeited and escheated to the United States; (1) all real estate in which the church held vested rights, either legal or equitable, on the 1st day of July, 1862; (2) real estate to the value of fifty thousand dollars at the time of its acquisition acquired after the 1st of July, 1862; (3) all

real estate held or occupied by the corporation at the date of its dissolution, for the purpose of the worship of 'God, or parsonage connected therewith, or burial ground, and property appurtenant to such real estate as may have buildings erected thereon for any of these purposes.

The property in which the church corporation had vested rights at the time of the passage of the act of July 1, 1862, consisted of the Temple Block, the Historian's Office, the Tithing Office, and the real estate connected with those respective premises. Similar titles have been held valid in *Hussey* v. *Smith,* 99 U. S. 20, 22; *Stringfellow* v. *Cain,* 99 U. S. 610, 616; *Colfield* v. *McClellan,* 16 Wall. 331. See also. *Lamb* v. *Davenport,* 18 Wall. 307, 313.

There can be no doubt, from the decisions of this court, that the Church of Jesus Christ of Latter-Day Saints had and held, on the first day of July, 1862, such an equitable interest in the Temple Block, the Tithing Office property, and the Historian's Office and grounds, as constituted a " vested right in real estate," which the act of Congress of that date declared should " not be impaired." The property still belongs to the church, and should have been set apart to it. *Bogardus* v. *Trinity Church,* 4 Sandf. Ch. (N. Y.) 633, 758; *Harvard College* v. *Boston,* 104 Mass. 470, 488.

VII. Under the averments of the bill and the proofs taken there was no authority to appoint a receiver, because : (1) The bill does not describe any property that the government claims has been escheated, or is subject to escheat or forfeiture; (2) There is no averment or claim that any of the personal property is subject to escheat or forfeiture to the government; (3) There is no averment in the bill, or proof, that any of the property referred to was in danger of being lost or injured, or that it was not safe in the hands of the persons who are alleged to be in the possession of the same — it is only claimed to be illegally in their possession, and that they have no right to hold it.

" The appointment of a receiver is not a matter of strict right. Such an application always calls for the exercise of judicial discretion, and the chancellor should so mould his

order that while favoring one, injustice is not done to another. If this cannot be accomplished the application should ordinarily be denied." *Fosdick* v. *Schall*, 99 U. S. 235, 253.

*Mr. Solicitor General Jenks* for the appellees.

*Mr. Joseph E. McDonald* (with whom was *Mr. John M. Butler* on the brief) for appellants, made the following point, not made by *Mr. Broadhead.*

If said act of Congress of March 3, 1887, is finally held constitutional and valid, the seventeenth section. thereof, wherein it is provided and required that " the court shall have power, and it shall be its duty, to make such decree or decrees as shall be proper to effectuate the transfer of the title to real property now held and used by such corporation for places of worship and parsonages connected therewith and burial grounds, and of the description mentioned in the *proviso* to section thirteen of this act, and in section twenty-six of this act, to the respective trustees mentioned in section twenty-six of this act," is a direct legislative declaration and determination by the Congress of the United States that the teachings, doctrines, tenets and practices of the church, sect, association or organization now known as the Church of Jesus Christ of Latter-Day Saints are not opposed to public policy and good morals, and are not contrary to the laws of the United States.

And if said church, sect, association or organization is competent in law to receive and hold by its trustees valuable real estate for its religious and charitable uses and purposes in accordance with the " tenets of said. sect and body," it is contrary to law, equity and reason to hold, as is held by the decree appealed. from, that all of the personal property and estate belonging to said corporation and dedicated to its religious and charitable uses and purposes is forfeited and escheated to the United States, on the ground that the retention of said personal property by said church, sect, association or organization, now known as the Church of Jesus Christ of Latter-Day Saints, and the appropriation and dedication thereof by

said church to its religious and charitable uses and purposes, would be opposed to public policy, good morals and contrary to law.

Mr. Justice Bradley, after stating the case, delivered the opinion of the court.

The principal questions raised are, first, as to the power of Congress to repeal the charter of the Church of Jesus Christ of Latter-Day Saints; and, secondly, as to the power of Congress and the courts to seize the property of said corporation and to hold the same for the purposes mentioned in the decree.

The power of Congress over the Territories of the United States is general and plenary, arising from and incidental to the right to acquire the Territory itself, and from the power given by the Constitution to make all needful rules and regulations respecting the Territory or other property belonging to the United States. It would be absurd to hold that the United States has power to acquire territory, and no power to govern it when acquired. The power to acquire territory, other than the territory northwest of the Ohio River, (which belonged to the United States at the adoption of the Constitution,) is derived from the treaty-making power and the power to declare and carry on war. The incidents of these powers are those of national sovereignty, and belong to all independent governments. The power to make acquisitions of territory by conquest, by treaty and by cession is an incident of national sovereignty. The territory of Louisiana, when acquired from France, and the territories west of the Rocky Mountains, when acquired from Mexico, became the absolute property and domain of the United States, subject to such conditions as the government, in its diplomatic negotiations, had seen fit to accept relating to the rights of the people then inhabiting those territories. Having rightfully acquired said territories, the United States government was the only one which could impose laws upon them, and its sovereignty over them was complete. No State of the Union had any such right of sover-

eignty over them; no other country or government had any such right. These propositions are so elementary, and so necessarily follow from the condition of things arising upon the acquisition of new territory, that they need no argument to support them. They are self-evident. Chief Justice Marshall, in the case of the *American Insurance Company* v. *Canter*, 1 Pet. 511, 542, well said: "Perhaps the power of governing a Territory belonging to the United States, which has not, by becoming a State, acquired the means of self-government, may result necessarily from the facts, that it is not within the jurisdiction of any particular State, and is within the power and jurisdiction of the United States. The right to govern may be the inevitable consequence of the right to acquire territory. Whichever may be the source whence the power is derived, the possession of it is unquestioned." And Mr. Justice Nelson delivering the opinion of the court in *Benner* v. *Porter*, 9 How. 235, 242, speaking of the territorial governments established by Congress, says: "They are legislative governments, and their courts legislative courts, Congress, in the exercise of its powers in the organization and government of the Territories, combining the powers of both the federal and state authorities." Chief Justice Waite, in the case of *National Bank* v. *County of Yankton*, 101 U. S. 129, 133, said: "In the organic act of Dakota there was not an express reservation of power in Congress to amend the acts of the territorial legislature, nor was it necessary. Such a power is an incident of sovereignty, and continues until granted away. Congress may not only abrogate laws of the territorial legislatures, but it may itself legislate directly for the local government. It may make a void act of the territorial legislature valid, and a valid act void. In other words, it has full and complete legislative authority over the people of the Territories and all the departments of the territorial governments. It may do for the Territories what the people, under the Constitution of the United States, may do for the States." In a still more recent case, and one relating to the legislation of Congress over the Territory of Utah itself, *Murphy* v. *Ramsey*, 114 U. S. 15, 44, Mr. Justice Matthews said:

"The counsel for the appellants in argument seem to question the constitutional power of Congress to pass the act of March 22, 1882, so far as it abridges the rights of electors in the Territory under previous laws.    But that question is, we think, no longer open to discussion.    It has passed beyond the stage of controversy into final judgment.    The people of the United States as sovereign owners of the national Territories, have supreme power over them and their inhabitants.    In the exercise of this sovereign dominion, they are represented by the government of the United States, to whom all the powers of government over that subject have been delegated, subject only to such restrictions as are expressed in the Constitution, or are necessarily implied in its terms."   Doubtless Congress, in legislating for the Territories would be subject to those fundamental limitations in favor of personal rights which are formulated in the Constitution and its amendments ; but these limitations would exist rather by inference and the general spirit of the Constitution from which Congress derives all its powers, than by any express and direct application of its provisions.

The supreme power of Congress over the Territories and over the acts of the territorial legislatures established therein, is generally expressly reserved in the organic acts establishing governments in said Territories.    This is true of the Territory of Utah.    In the 6th section of the act establishing a territorial government in Utah, approved September 9, 1850, it is declared "that the legislative powers of said Territory shall extend to all rightful subjects of legislation, consistent with the Constitution of the United States and the provisions of this act. . . . All the laws passed by the legislative assembly and governor shall be submitted to the Congress of the United States, and if disapproved shall be null and of no effect."    9 Stat. 454.

This brings us directly to the question of the power of Congress to revoke the charter of the Church of Jesus Christ of Latter-Day Saints.    That corporation, when the Territory of Utah was organized, was a corporation *de facto*, existing under an ordinance of the so-called State of Deseret, approved Feb-

ruary 8, 1851. This ordinance had no validity except in the voluntary acquiescence of the people of Utah then residing there. Deseret, or Utah, had ceased to belong to the Mexican government by the treaty of Guadalupe Hidalgo, and in 1851 it belonged to the United States, and no government without authority from the United States, express or implied, had any legal right to exist there. The assembly of Deseret had no power to make any valid law. Congress had already passed the law for organizing the Territory of Utah into a government; and no other government was lawful within the bounds of that Territory. But after the organization of the territorial government of Utah under the act of Congress, the legislative assembly of the Territory passed the following resolution: "*Resolved, by the Legislative Assembly of the Territory of Utah*, That the laws heretofore passed by the provisional government of the State of Deseret, and which do not conflict with the organic act of said Territory, be and the same are hereby declared to be legal and in full force and virtue, and shall so remain until superseded by the action of the legislative assembly of the Territory of Utah." This resolution was approved October 4, 1851. The confirmation was repeated on the 19th of January, 1855, by the act of the legislative assembly entitled, "An act in relation to the compilation and revision of the laws and resolutions in force in Utah Territory, their publication and distribution." From the time of these confirmatory acts, therefore, the said corporation had a legal existence under its charter. But it is too plain for argument that this charter, or enactment, was subject to revocation and repeal by Congress whenever it should see fit to exercise its power for that purpose. Like any other act of the territorial legislature, it was subject to this condition. Not only so, but the power of Congress could be exercised in modifying or limiting the powers and privileges granted by such charter; for if it could repeal, it could modify; the greater includes the less. Hence there can be no question that the act of July 1, 1862, already recited, was a valid exercise of congressional power. Whatever may be the effect or true construction of this act, we have no doubt of its validity. As far

as it went it was effective. If it did not absolutely repeal the charter of the corporation, it certainly took away all right or power which may have been claimed under it to establish, protect or foster the practice of polygamy, under whatever disguise it might be carried on; and it also limited the amount of property which might be acquired by the Church of Jesus Christ of Latter-Day Saints; not interfering, however, with vested rights in real estate existing at that time. If the act of July 1, 1862, had but a partial effect, Congress had still the power to make the abrogation of its charter absolute and complete. This was done by the act of 1887. By the 17th section of that act it is expressly declared that "the acts of the legislative assembly of the Territory of Utah, incorporating, continuing or providing for the corporation known as the Church of Jesus Christ of Latter-Day Saints, and the ordinance of the so-called general assembly of the State of Deseret, incorporating the said church, so far as the same may now have legal force and validity, are hereby disapproved and annulled, and the said corporation, so far as it may now have or pretend to have any legal existence, is hereby dissolved." This absolute annulment of the laws which gave the said corporation a legal existence has dissipated all doubt on the subject, and the said corporation has ceased to have any existence as a civil body, whether for the purpose of holding property or of doing any other corporate act. It was not necessary to resort to the condition imposed by the act of 1862, limiting the amount of real estate which any corporation or association for religious or charitable purposes was authorized to acquire or hold; although it is apparent from the findings of the court that this condition was violated by the corporation before the passage of the act of 1887. Congress, for good and sufficient reasons of its own, independent of that limitation, and of any violation of it, had a full and perfect right to repeal its charter and abrogate its corporate existence, which of course depended upon its charter.

The next question is, whether Congress or the court had the power to cause the property of the said corporation to be seized and taken possession of, as was done in this case.

When a business corporation, instituted for the purposes of gain, or· private interest, is dissolved, the. mcdern doctrine is, that its property, after payment of its debts, equitably belongs to its stockholders.     But this doctrine has never been extended to public or charitable corporations.     As to these, the ancient and established rule prevails, namely : that when a corpora-. tion is dissolved, its personal property, like that of a man dying without heirs, ceases to be the subject of private owner-ship, and becomes subject to the disposal of the sovereign authority ; whilst its real estate reverts or, escheats to the grantor or donor, unless some other course of devolution has been directed· by positive law, though still subject as we shall hereafter see to the charitable use.     To this rule the corpora-tion in question was undoubtedly subject.     But the grantor of all, or the principal part, of the real estate of the Church of Jesus Christ of Latter-Day Saints was really the United States, from whom the property was derived by the church, or its trustees, ·through the operation of the town site act. Besides, as we have seen, the act of 1862 expressly declared that all real estate acquired or held by any of the corporations or associations therein mentioned, (of. which the Church of Jesus Christ of Latter-Day Saints was one,) contrary to the provisions of that act, should be forfeited and escheat to the United States, with a saving of existing vested rights.     The act prohibited the acquiring or holding of real estate of ·greater value than $50,000 in a Territory, and no legal title had vested in· any of the lands in Salt Lake City at that time, as the town site act was not passed until March 2, 1867. There can be no doubt, therefore, that the real estate of the corporation in question could not, on its dissolution, revert or pass to any other person or persons than. the United States.

If it be urged that the real estate did not stand in the name of the corporation, but in the name· of a trustee. or trustees, and therefore was not subject to the rules relating to cor-porate property, the substance of the difficulty still remains. It cannot be contended that the prohibition of the act of 1862 could have been so easily evaded as by putting the property of the corporation into the hands of trustees.     The equitable

or trust estate was vested in the corporation. The trustee held it for no other purpose; and the corporation being dissolved that purpose was at an end. The trust estate devolved to the United States in the same manner as the legal estate would have done had it been in the hands of the corporation. The trustee became trustee for the United States instead of trustee for the corporation. We do not now speak of the religious and charitable uses for which the corporation, through its trustee, held and managed the property. That aspect of the subject is one which places the power of the government and of the court over the property on a distinct ground.

Where a charitable corporation is dissolved, and no private donor, or founder, appears to be entitled to its real estate, (its personal property not being subject to such reclamation,) the government, or sovereign authority, as the chief and common guardian of the State, either through its judicial tribunals or otherwise, necessarily has the disposition of the funds of such corporation, to be exercised, however, with due regard to the objects and purposes of the charitable uses to which the property was originally devoted, so far as they are lawful and not repugnant to public policy. This is the general principle, which will be more fully discussed further on. In this direction, it will be pertinent, in the meantime, to examine into the character of the corporation of the Church of Jesus Christ of Latter-Day Saints, and the objects which, by its constitution and principles, it promoted and had in view.

It is distinctly stated in the pleadings and findings of fact, that the property of the said corporation was held for the purpose of religious and charitable uses. But it is also stated in the findings of fact, and is a matter of public notoriety, that the religious and charitable uses intended to be subserved and promoted are the inculcation and spread of the doctrines and usages of the Mormon Church, or Church of Latter-Day Saints, one of the distinguishing features of which is the practice of polygamy — a crime against the laws, and abhorrent to the sentiments and feelings of the civilized world. Notwithstanding the stringent laws which have been passed by Congress — notwithstanding all the efforts made to suppress

this barbarous practice — the sect or community composing
the Church of Jesus Christ of Latter-Day Saints perseveres,
in defiance of law, in preaching, upholding, promoting and
defending it.   It is a matter of public notoriety that its emis-
saries are engaged in many countries in propagating this
nefarious doctrine, and urging its converts to join the com-
munity in Utah.   The existence of such a propaganda is a
blot on our civilization.   The organization of a community for
the spread and practice of polygamy is, in a measure, a return
to barbarism.   It is contrary to the spirit of Christianity and
of the civilization which Christianity has produced in the
Western world.   The question, therefore, is whether the pro-
motion of such a nefarious system and practice, so repugnant
to our laws and to the principles of our civilization, is to be
allowed to continue by the sanction of the government itself;
and whether the funds accumulated for that purpose shall be
restored to the same unlawful uses as heretofore, to the detri-
ment of the true interests of civil society.

It is unnecessary here to refer to the past history of the
sect; to their defiance of the government authorities, to their
attempt to establish an independent community, to their
efforts to drive from the territory all who were not connected
with them in communion and sympathy.   The tale is one of
patience on the part of the American government and people,
and of contempt of authority and resistance to law on the
part of the Mormons.   Whatever persecutions they may have
suffered in the early part of their history, in Missouri and
Illinois, they have no excuse for their persistent defiance of
law under the government of the United States.

One pretence for this obstinate course is, that their belief in
the practice of polygamy, or in the right to indulge in it, is a
religious belief, and, therefore, under the protection of the con-
stitutional guaranty of religious freedom.   This is altogether
a sophistical plea.   No doubt the Thugs of India imagined
that their belief in the right of assassination was a religious
belief; but their thinking so did not make it so.   The prac-
tice of suttee by the Hindu widows may have sprung from a
supposed religious conviction.   The offering of human sacri-

fices by our own ancestors in Britain was no doubt sanctioned by an equally conscientious impulse. But no one, on that account, would hesitate to brand these practices, now, as crimes against society, and obnoxious to condemnation and punishment by the civil authority.

The State has a perfect right to prohibit polygamy, and all other open offences against the enlightened sentiment of mankind, notwithstanding the pretence of religious conviction by which they may be advocated and practised. *Davis* v. *Beason*, 133 U. S. 333. And since polygamy has been forbidden by the laws of the United States, under severe penalties, and since the Church of Jesus Christ of Latter-Day Saints has persistently used and claimed the right to use, and the unincorporated community still claims the same right to use, the funds with which the late corporation was endowed for the purpose of promoting and propagating the unlawful practice as an integral part of their religious usages, the question arises, whether the government, finding these funds without legal ownership, has or has not, the right, through its courts, and in due course of administration, to cause them to be seized and devoted to objects of undoubted charity and usefulness — such for example as the maintenance of schools — for the benefit of the community whose leaders are now misusing them in the unlawful manner above described ; setting apart, however, for the exclusive possession and use of the church, sufficient and suitable portions of the property for the purposes of public worship, parsonage buildings and burying grounds, as provided in the law.

The property in question has been dedicated to public and charitable uses. It matters not whether it is the product of private contributions, made during the course of half a century, or of taxes imposed upon the people, or of gains arising from fortunate operations in business, or appreciation in values ; the charitable uses for which it is held are stamped upon it by charter, by ordinance, by regulation and by usage, in such an indelible manner that there can be no mistake as to their character, purpose or object.

The law respecting property held for charitable uses of

course depends upon the legislation and jurisprudence of the country in which the property is situated and the uses are carried out; and when the positive law affords no specific provision for actual cases that arise, the subject must necessarily be governed by those principles of reason and public policy which prevail in all civilized and enlightened communities.

The principles of the law of charities are not confined to a particular people or nation, but prevail in all civilized countries pervaded by the spirit of Christianity. They are found imbedded in the civil law of Rome, in the laws of European nations, and especially in the laws of that nation from which our institutions are derived. A leading and prominent principle prevailing in them all is, that property devoted to a charitable and worthy object, promotive of the public good, shall be applied to the purposes of its dedication, and protected from spoliation and from diversion to other objects. Though devoted to a particular use, it is considered as given to the public, and is, therefore, taken under the guardianship of the laws. If it cannot be applied to the particular use for which it was intended, either because the objects to be subserved have failed, or because they have become unlawful and repugnant to the public policy of the State, it will be applied to some object of kindred character so as to fulfil in substance, if not in manner and form, the purpose of its consecration.

The manner in which the due administration and application of charitable estates is secured, depends upon the judicial institutions and machinery of the particular government to which they are subject. In England, the court of chancery is the ordinary tribunal to which this class of cases is delegated; and there are comparatively few which it is not competent to administer. Where there is a failure of trustees, it can appoint new ones; and where a modification of uses is necessary in order to avoid a violation of the laws, it has power to make the change. There are some cases, however, which are beyond its jurisdiction; as where, by statute, a gift to certain uses is declared void and the property goes to the king; and in some other cases of failure of the charity. In such cases the king as *parens patriæ*, under his sign manual, disposes of

the fund to such uses, analogous to those intended, as seems to him expedient and wise.

These general principles are laid down in all the principal treatises on the subject, and are the result of numerous cases and authorities. See Duke on Char. Uses, c. 10, §§ 4, 5, 6; Boyle on Char. Bk. 2, c. 3, c. 4; 2 Story's Eq. Jur. §§ 1167 *et seq.; Attorney General* v. *Guise,* 2 Vernon, 266; *Moggridge* v. *Thackwell,* 7 Ves. 36, 77; *De Themmines* v. *De Bonneval,* 5 Russ. 289; *Town of Pawlet* v. *Clark,* 9 Cranch, 292, 335, 336; *Beatty* v. *Kurtz,* 2 Pet. 566; *Vidal* v. *Girard's Executors,* 2 How. 127; *Jackson* v. *Phillips,* 14 Allen, 539; *Ould* v. *Washington Hospital,* 95 U. S. 303; *Jones* v. *Habersham,* 107 U. S. 174.

The individual cases cited are but *indicia* of the general principle underlying them. As such they are authoritative, though often in themselves of minor importance. Bearing this in mind, it is interesting to see how far back the principle is recognized. In the Pandects of Justinian we find cases to the same effect as those referred to, antedating the adoption of Christianity as the religion of the Empire. Amongst others, in the Digest, lib. 33, tit. 2, law 16, a case is reported which occurred in the early part of the third century, in which a legacy was left to a city in order that from the yearly revenues games might be celebrated for the purpose of preserving the memory of the deceased. It was not lawful at that time to celebrate these games. The question was, what was to be done with this legacy. Modestinus, a celebrated jurist of authority, replied, "Since the testator wished games to be celebrated which are not permitted, it would be unjust that the amount which he has destined to that end should go back to the heirs. Therefore let the heirs and magnates of the city be cited, and let an examination be made to ascertain how the trust may be employed so that the memory of the deceased may be preserved in some other and lawful manner." Here is the doctrine of charitable uses in a nutshell.

Domat, the French jurist, writing on the civil law, after explaining the nature of pious and charitable uses, and the favor with which they are treated in the law, says, "If a pious

legacy were destined to some use which could not have its effect, as if a testator had left a legacy for building a church for a parish, or an apartment in an hospital, and it happened, either that before his death the said church, or the said apartment had been built out of some other fund, or that it was noways necessary or useful, the legacy would not for all that remain without any use; but it would be laid out on other works of piety for that parish, or for that hospital, according to the directions that should be given in this matter by the persons to whom this function should belong."[1] And for this principle he cites a passage from the Pandects. Domat's Civil Law, book 4, title 2, section 6, par. 6.

By the Spanish law, whatever was given to the service of God, became incapable of private ownership, being held by the clergy as guardians or trustees; and any part not required for their own support, and the repairs, books and furniture of the church, was devoted to works of piety, such as feeding and clothing the poor, supporting orphans, marrying poor virgins, redeeming captives and the like. Partida III. tit. 28, ll. 12–15. When property was given for a particular object, as a church, a hospital, a convent or a community, etc., and the object failed, the property did not revert to the donor, or his heirs,–but devolved to the crown, the church or other convent or community, unless the donation contained an express condition in writing to the contrary. Tapia, Febrero Novisimo, lib. 2, tit. 4, cap. 22, §§ 24–26.

A case came before Lord Bacon in 1619, *Bloomfield* v. *Stowe Market*, Duke on Char. Uses, 624, in which lands had been given before the Reformation to be sold, and the proceeds applied, one-half to the making of a highway from the town

---

[1] Si un legs pieux était destiné à quelque usage qui ne pût avoir son effet, comme si un testateur avait légué pour faire une église pour une paroisse, ou un bâtiment dans un hôpital, et qu'il arrivât, ou qu'avant sa mort cette église ou ce bâtiment eût été fait de quelque autre fonds, ou qu'il n'y en eût point de nécessité ni d'utilité, le legs ne demeurerait pas pour cela sans aucun usage; mais il serait employé à d'autres œuvres de piété pour cette paroisse ou pour cet hôpital, selon les destinations qu'en feraient les personnes que cette fonction pourrait regarder.

in which the lands were, one-fourth to the repair of a church in that town, and the other fourth to the priest of the church to say prayers for the souls of the donor and others. The Lord Keeper decreed the establishment of the uses for making the highway and repairing the church, and directed the remaining fourth (which could not, by reason of the change in religion, be applied as directed by the donor) to be divided between the poor of the same town and the poor of the town where the donor inhabited.

In the case of *Baliol College*, which came before the court of chancery from time to time for over a century and a half, the same principle was asserted, of directing a charity fund to a different, though analogous use, where the use originally declared had become contrary to the policy of the law. There, a testator in 1679, when Episcopacy was established by law in Scotland, gave lands in trust to apply the income to the education of Scotchmen at Oxford, with a view to their taking Episcopal orders and settling in Scotland. Presbyterianism being reëstablished in Scotland after the Revolution of 1688, the object of the bequest could not be carried into effect; and the court of chancery, by successive decrees of Lord Somers and Lord Hardwicke, directed the income of the estate to be applied to the education of a certain number of Scotch students at Baliol College, without the condition of taking orders; and, in consideration of this privilege, directed the surplus of the income to be applied to the college library. See the cases of *Attorney General* v. *Guise*, 2 Vernon, 266; *Attorney General* v. *Baliol College*, 9 Mod. 407; *Attorney General* v. *Glasgow College*, 2 Collyer, 665; *S. C.* 1 H. L. Cas. 800. And see abridgment of the above cases in *Jackson* v. *Phillips*, 14 Allen, 581, 582.

Lord Chief Justice Wilmot, in his opinion in *Attorney General* v. *Lady Downing*, 1 Wilmot, 32, looking at the case in the supposition that the trusts of the will (which were for instituting a college) were illegal and void, or of such a nature as not fit to be carried into execution, said: "This court has long made a distinction between superstitious uses and mistaken charitable uses. By mistaken, I mean such

as are repugnant to that sound constitutional policy, which controls the interest, wills and wishes of individuals, when they clash with the interest and safety of the whole community. Property, destined to superstitious uses, is given by law of parliament to the king, to dispose of as he pleases; and it falls properly under the cognizance of a court of revenue. But where property is given to mistaken charitable uses, this court distinguishes between the charity and the use; and seeing the charitable bequest in the intention of the testator, they execute the intention, varying the use, as the king, who is the curator of all charities, and the constitutional trustee for the performance of them, pleases to direct and appoint." "This doctrine is now so fully settled that it cannot be departed from." *Ib.*

In *Moggridge* v. *Thackwell,* 7 Ves. 36, 69, Lord Eldon said: "I have no doubt, that cases much older than I shall cite may be found; all of which appear to prove that if the testator has manifested a general intention to give to charity, the failure of the particular mode in which the charity is to be effectuated shall not destroy the charity: but, if the substantial intention is charity, the law will substitute another mode of devoting the property to charitable purposes, though the formal intention as to the mode cannot be accomplished." In Hill on Trustees, page 450, after citing this observation of Lord Eldon, it is added: "In accordance with these principles, it has frequently been decided that where a testator has sufficiently expressed his intention to dispose of his estate in trust for charitable purposes *generally,* the general purpose will be enforced by the court to the exclusion of any claim of the next of kin to take under a resulting trust; although the *particular* purpose or mode of application is not declared at all by the testator. And the same rule prevails, although the testator refers to some past or intended declaration of the particular charity, which declaration is not made or cannot be discovered; and although the selection of the objects of the charity and the mode of application are left to the discretion of the trustees. And it is immaterial that the trustees refuse the gift, or die, or that their appointment is revoked in the

lifetime of the testator, causing a lapse of the bequest at law. The same construction will also be adopted where a *particular* charitable purpose is declared by the testator which does not exhaust the whole value of the estate; or where the particular trust cannot be carried into effect, either for its uncertainty or its illegality, or for want of proper objects. And in all these cases the general intention of the testator in favor of charity will be effectuated by the court through a *cy-près* application of the fund." The same propositions are laid down by Mr. Justice Story in his Equity Jurisprudence, sections 1167 *et seq.* But it is unnecessary to make further quotations.

These authorities are cited (and many more might be adduced) for the purpose of showing that where property has been devoted to a public or charitable use which cannot be carried out on account of some illegality in, or failure of the object, it does not, according to the general law of charities, revert to the donor or his heirs, or other representatives, but is applied under the direction of the courts, or of the supreme power in the State, to other charitable objects lawful in their character, but corresponding, as near as may be, to the original intention of the donor.

They also show that the authority thus exercised arises, in part, from the ordinary power of the court of chancery over trusts, and, in part, from the right of the government, or sovereign, as *parens patriæ*, to supervise the acts of public and charitable institutions in the interests of those to be benefited by their establishment; and, if their funds become *bona vacantia*, or left without lawful charge, or appropriated to illegal purposes, to cause them to be applied in such lawful manner as justice and equity may require.

If it should be conceded that a case like the present transcends the ordinary jurisdiction of the court of chancery, and requires for its determination the interposition of the *parens patriæ* of the State, it may then be contended that, in this country, there is no royal person to act as *parens patriæ*, and to give direction for the application of charities which cannot be administered by the court. It is true we have no such chief magistrate. But, here, the legislature is the *parens*

*patriæ*, and, unless restrained by constitutional limitations, possesses all the powers in this regard which the sovereign possesses in England. Chief Justice Marshall, in the *Dartmouth College Case*, said: "By the revolution, the duties, as well as the powers, of government devolved on the people. . . . It is admitted that among the latter was comprehended the transcendent power of parliament, as well as that of the executive department." 4 Wheat. 651. And Mr. Justice Baldwin, in *McGill* v. *Brown*, Brightly, 346, 373, a case arising on Sarah Zane's will, referring to this declaration of Chief Justice Marshall, said: "The revolution devolved on the State all the transcendent power of parliament, and the prerogative of the crown, and gave their acts the same force and effect."

Chancellor Kent says: "In this country, the legislature or government of the State, as *parens patriæ*, has the right to enforce all charities of a public nature, by virtue of its general superintending authority over the public interests, where no other person is entrusted with it." 4 Kent Com. 508, note.

In *Fontain* v. *Ravenel*, 17 How. 369, 384, Mr. Justice McLean, delivering the opinion of this court, in a charity case, said: "When this country achieved its independence, the prerogatives of the crown devolved upon the people of the States. And this power still remains with them except so far as they have delegated a portion of it to the federal government. The sovereign will is made known to us by legislative enactment. The State, as a sovereign, is the *parens patriæ*."

This prerogative of *parens patriæ* is inherent in the supreme power of every State, whether that power is lodged in a royal person or in the legislature, and has no affinity to those arbitrary powers which are sometimes exerted by irresponsible monarchs to the great detriment of the people and the destruction of their liberties. On the contrary, it is a most beneficent function, and often necessary to be exercised in the interests of humanity, and for the prevention of injury to those who cannot protect themselves. Lord Chancellor Somers, in *Cary* v. *Bertie*, 2 Vernon, 333, 342, said: "It is true infants are always favored. In this court there are several things which

belong to the king as *pater patriæ*, and fall under the care and direction of this court, as charities, infants, idiots, lunatics, etc."

The Supreme Judicial Court of Massachusetts well said, in *Sohier* v. *Mass. Gen. Hospital*, 3 Cush. 483, 497 : "It is deemed indispensable that there should be a power in the legislature to authorize a sale of the estates of infants, idiots, insane persons and persons not known, or not in being, who cannot act for themselves. The best interest of these persons, and justice to other persons, often require that such sales should be made. It would be attended with incalculable mischiefs, injuries and losses, if estates, in which persons are interested, who have not capacity to act for themselves, or who cannot be certainly ascertained, or are not in being, could under no circumstances, be sold, and perfect titles effected. But, in such cases, the legislature, as *parens patriæ*, can disentangle and unfetter the estates, by authorizing a sale, taking precaution that the substantial rights of all parties are protected and secured."

These remarks in reference to infants, insane persons and persons not known, or not in being, apply to the beneficiaries of charities, who are often incapable of vindicating their rights, and justly look for protection to the sovereign authority, acting as *parens patriæ*. They show that this beneficent function has not ceased to exist under the change of government from a monarchy to a republic; but that it now resides in the legislative department, ready to be called into exercise whenever required for the purposes of justice and right, and is as clearly capable of being exercised in cases of charities as in any other cases whatever.

It is true, that in some of the States of the Union in which charities are not favored, gifts to unlawful or impracticable objects, and even gifts affected by merely technical difficulties, are held to be void, and the property is allowed to revert to the donor or his heirs or other representatives. But this is in cases where such heirs or representatives are at hand to claim the property, and are ascertainable. It is difficult to see how this could be done in a case where it would be impossible for any such claim to be made, — as where the property has been the resulting accumulation of ten thousand petty contributions,

extending through a long period of time, as is the case with all ecclesiastical and community funds. In such a case the only course that could be satisfactorily pursued, would be that pointed out by the general law of charities, namely, for the government, or the court of chancery, to assume the control of the fund, and devote it to lawful objects of charity most nearly corresponding to those to which it was originally destined. It could not be returned to the donors, nor distributed among the beneficiaries.

The impracticability of pursuing a different course, however, is not the true ground of this rule of charity law. The true ground is that the property given to a charity becomes in a measure public property, only applicable as far as may be, it is true, to the specific purposes to which it is devoted, but within those limits consecrated to the public use, and become part of the public resources for promoting the happiness and well-being of the people of the State. Hence, when such property ceases to have any other owner, by the failure of the trustees, by forfeiture for illegal application, or for any other cause, the ownership naturally and necessarily falls upon the sovereign power of the State; and thereupon the court of chancery, in the exercise of its ordinary jurisdiction, will appoint a new trustee to take the place of the trustees that have failed or that have been set aside, and will give directions for the further management and administration of the property; or if the case is beyond the ordinary jurisdiction of the court, the legislature may interpose and make such disposition of the matter as will accord with the purposes of justice and right. The funds are not lost to the public as charity funds; they are not lost to the general objects or class of objects which they were intended to subserve or effect. The State, by its legislature or its judiciary, interposes to preserve them from dissipation and destruction, and to set them up on a new basis of usefulness, directed to lawful ends, coincident, as far as may be, with the objects originally proposed.

The interposition of the legislature in such cases is exemplified by the case of *The Town of Pawlet* v. *Clark,* 9 Cranch, 292, which arose in Vermont. In the town charter, granted

in the name of the king in 1761, one entire share of the town lands was granted "as a glebe for the Church of England as by law established." There was no Episcopal church in the town until 1802. In that year one was organized, and its parson laid claim to the glebe lands, and leased them to Clark and others. Of course, this church had never been connected with the "Church of England as by law established;" and the institution of such a church in 1802 was impossible, and would have been contrary to the public policy of the State. Meantime, in 1794, the legislature had granted the glebe lands to the several towns to be rented by the selectmen for the sole use and support of public worship, without restriction as to sect or denomination. This law was subsequently repealed, and in 1805 the legislature passed another act, granting the glebe lands to the respective towns, to apply the rents to the use of schools therein. This was held to be a valid disposition. Mr. Justice Story, in the course of an elaborate opinion, amongst other things, showed that a mere voluntary society of Episcopalians within a town could no more entitle themselves, on account of their religious tenets, to the glebe than any other society worshipping therein. "The glebe," he said, "remained *hœreditas jacens*, and the State, which succeeded to the rights of the crown, might, with the assent of the town, alien or encumber it, or might erect an Episcopal church therein," etc. p. 335. "By the revolution the State of Vermont succeeded to all the rights of the crown as to the unappropriated as well as the appropriated glebes." p. 335. Again: "Without the authority of the State, however, they [the towns] could not apply the lands to other uses than public worship; and in this respect the statute of 1805 conferred a new right which the towns might or might not exercise at their own pleasure." [1]  p. 336.

---

[1] *Note by* MR. JUSTICE BRADLEY. The frequency with which this power of the legislature is exerted is shown by a recurrence to the private laws of any of the States. Taking New Jersey for example; the Index of Private Laws, under the head of "Academies" alone, refers to the following acts:

1. By an ancient charter the trustees of the township of Bergen held

Coming to the case before us, we have no doubt that the general law of charities which we have described is applicable

certain lands for the common benefit of the freeholders, a portion of which was set apart for the free school of the township. An academy being organized and incorporated in the town, its trustees claimed this portion and sold certain parcels of it. The legislature, on the representation of the trustees of the township, confirmed the sales that had been made, but directed that the proceeds, and the land unsold should be vested in the trustees of the township, for the use and benefit of the free school alone. This, of course, the court of chancery could not have done. Laws of 1814, p. 202.

2. By an act of March 2, 1848, it was enacted, that the title of a lot in, the village of Hackensack, formerly vested in the trustees of the Washington Academy, should be vested in the Washington Institute of Hackensack, to be held by them for. the purposes and trusts, and subject to the conditions, of the articles of their association. Laws of 1848, p. 118. It is probable that the first institution had ceased to exist.

3. A certain school-house and lot in the city of Newark was held by trustees for the benefit of "The Female Union School Society," for the education of indigent female children. Not being longer needed for that purpose, in consequence of the establishment of public free schools in the city, the legislature authorized the trustees, with the assent of the association, to sell the property and pay over the proceeds to a new corporation created for the support and education of destitute orphan children of the city, called The Protestant Foster Home Society. Laws of 1849, p. 143.

4. In 1854 an act was passed, authorizing the trustees of the Camden Academy to convey their property to the Board of Education of the city of Camden. The reason appears from the following recital of the act " Whereas a certain lot of land [describing it] has heretofore been given or bequeathed for the purpose of erecting a school-house thereon; and whereas the building known as the Camden Academy has been erected thereon by voluntary subscription; and whereas the donors of said land and the subscribers to the funds, for the erection of said building, have, with few. exceptions, departed this life, and the objects which they had in view have in a great degree been frustrated; and whereas it is considered that the same may be best promoted by securing said lot of land, and the building thereon, for the occupancy of public schools of the city of Camden; *Be it . enacted*," etc. Laws of 1854, p. 353.

5. By an act passed in 1871, the trustees of Chatham Academy, in the county of Morris, were authorized to convey any part of the real estate held by them, or to sell the same and pay over the proceeds, to the trustees of Chatham School District No. 1, to be used by them for educational purposes only. Laws of 1871, p. 670. Here was, evidently, another case of an academy having run down, and its operations discontinued.

Instances of this kind of legislation, in which the legislature clearly acts as *parens patriæ,* may be found almost without number.

thereto. It is true, no formal declaration has been made by
Congress or the territorial legislature as to what system of
laws shall prevail there. But it is apparent from the language
of the organic act, which was passed September 9, 1850, (9
Stat. 453,) that it was the intention of Congress that the sys-
·tem of common law and equity which generally prevails in
this country should be operative in the Territory of Utah,
except as it might be altered by legislation. In the 9th
section of the act it is declared that the Supreme and District
Courts of the Territory "shall possess *chancery* as well as
*common law* jurisdiction," and the whole phraseology of the
act implies the same thing. The territorial legislature, in like
manner, in the first section of the act regulating procedure,
approved December 30, 1852, declared that all the courts of
the Territory should have "*law* and *equity* jurisdiction in civil
cases." In view of these significant provisions, we infer that
the general system of common law and equity, as it prevails in
this country, is the basis of the laws of the Territory of Utah.
We may, therefore, assume that the doctrine of charities is ap-
plicable to the Territory, and that Congress, in the exercise of
its plenary legislative power over it, was entitled to carry out
that law and put it in force, in its application to the Church
of Jesus Christ of Latter-Day Saints.

. Indeed, it is impliedly admitted by the corporation itself,
in its answer to the bill in this case, that the law of charities
exists in Utah, for it expressly says: " That it was, at the time
of its creation, ever since has been, and still is, a corporation
or association for religious or charitable uses." And again it
says:

"That prior to February 28, 1887, it had, as such corpora-
tion, as it lawfully might by the powers granted to it by its
acts of incorporation, acquired and held from time to time
certain personal property, goods and chattels, all of which it
had acquired, held and used solely and only for charitable and
religious purposes; that on the 28th day of .February, A.D.
1887, it still held and owned certain personal property, goods
and chattels donated to it by the members of said church and
friends thereof solely and only for use and distribution for

charitable and religious purposes;" and "that on February 28, 1887, John Taylor, who then held all the personal property, moneys, stocks and bonds belonging to said defendant corporation as trustee in trust for said defendant, by and with the consent and approval of defendant, donated, transferred and conveyed all of said personal property, moneys, stocks and bonds held by him belonging to said defendant corporation, after setting apart and reserving certain moneys and stocks then held by him, sufficient in amount and necessary for the payment of the then existing indebtedness of said defendant corporation, to certain ecclesiastical corporations created and existing under and by virtue of the laws of the Territory of Utah, to be devoted by said ecclesiastical corporations solely and only to charitable and religious uses and purposes."

And the interveners, Romney and others, who claim to represent the hundred thousand and more individuals of the Mormon Church in their petition say:

"That the said Church of Jesus Christ of Latter-Day Saints is and for many years last past has been a voluntary religious society or association, organized and existing in the Territory of Utah for religious and charitable purposes.

"That said petitioners and others, for whose benefit they file this petition, are members of said church, residing in said Territory; that said church became possessed of all the above-described property, in accordance with its established rules and customs, by the voluntary contributions, donations and dedications of its said members, to be held, managed and applied to the use and benefit of said church and for the maintenance of its religion and charities by trustees appointed by said members semi-annually at the general conference or meeting of said members."

The foregoing considerations place it beyond doubt that the general law of charities, as understood and administered in our Anglo-American system of laws, was and is applicable to the case now under consideration.

Then looking at the case as the finding of facts presents it, we have before us — Congress had before it — a contumacious

organization, wielding by its resources an immense power in the Territory of Utah, and employing those resources and that power in constantly attempting to oppose, thwart and subvert the legislation of Congress and the will of the government of the United States. Under these circumstances we have no doubt of the power of Congress to do as it did.

It is not our province to pass judgment upon the necessity or expediency of the act of February 19, 1887, under which this proceeding was taken. The only question we have to consider in this regard, is as to the constitutional power of Congress to pass it. Nor are we now called upon to declare what disposition ought to be made of the property of the Church of Jesus Christ of Latter-Day Saints. This suit is, in some respects, an ancillary one, instituted for the purpose of taking possession of and holding for final disposition the property of the defunct corporation in the hands of a receiver, and winding up its affairs. To that extent, and to that only, the decree of the Circuit Court has gone. In the proceedings which have been instituted in the District Court of the Territory, it will be determined whether the real estate of the corporation which has been seized (excepting the portions exempted by the act) has, or has not, escheated or become forfeited to the United States. If it should be decided in the affirmative, then, pursuant to the terms of the act, the property so forfeited and escheated will be disposed of by the Secretary of the Interior, and the proceeds applied to the use and benefit of common schools in the Territory.

It is obvious that any property of the corporation which may be adjudged to be forfeited and escheated will be subject to a more absolute control and disposition by the government than that which is not so forfeited. The non-forfeited property will be subject to such disposition only as may be required by the law of charitable uses; whilst the forfeited and escheated property, being subject to a more absolute control of the government, will admit of a greater latitude of discretion in regard to its disposition. As we have seen, however, Congress has signified its will in this regard, having declared that the proceeds shall be applied to the use and benefit of

common schools in the Territory. Whether that will be a proper destination for the non-forfeited property will be a matter for future consideration in view of all the circumstances of the case.

As to the constitutional question, we see nothing in the act which, in our judgment, transcends the power of Congress over the subject. We have already considered the question of its power to repeal the charter of the corporation. It certainly also had power to direct proceedings to be instituted for the forfeiture and escheat of the real estate of the corporation; and, if a judgment should be rendered in favor of the government in these proceedings, the power to dispose of the proceeds of the lands thus forfeited and escheated, for the use and benefit of common schools in the Territory, is beyond dispute. It would probably have power to make such a disposition of the proceeds if the question were merely one of charitable uses, and not of forfeiture. Schools and education were regarded by the Congress of the Confederation as the most natural and obvious appliances for the promotion of religion and morality. In the ordinance of 1787, passed for the government of the Territory Northwest of the Ohio, it is declared, Art. 3, "Religion, morality and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Mr. Dane, who is reputed to have drafted the said ordinance, speaking of some of the statutory provisions of the English law regarding charities as inapplicable to America, says: "But in construing these laws, rules have been laid down, which are valuable in every State; as that the erection of schools and the relief of the poor are always right, and the law will deny the application of private property only as to uses the nation deems superstitious." 4 Dane's Abridg. 239.

The only remaining constitutional question arises upon that part of the 17th section of the act, under which the present proceedings were instituted. We do not well see how the constitutionality of this provision can be seriously disputed, if it be conceded or established that the corporation ceased to

exist, and that its property thereupon ceased to have a law-
ful owner, and reverted to the care and protection of the gov-
ernment as *parens patriæ*. This point has already been fully
discussed. We have no doubt that the state of things referred
to existed, and that the right of the government to take pos-
session of the property followed thereupon.

The application of Romney and others, representing the
unincorporated members of the Church of Jesus Christ of Lat-
ter-Day Saints, is fully disposed of by the considerations
already adduced. The principal question discussed has been,
whether the property of the church was in such a condition
as to authorize the government and the court to take posses-
sion of it and hold it until it shall be seen what final disposi-
tion of it should be made; and we think it was in such a
condition, and that it is properly held in the custody of the
receiver. The rights of the church members will necessarily
be taken into consideration in the final disposition of the case.
There is no ground for granting their present application.
The property is in the custody of the law, awaiting the judg-
ment of the court as to its final disposition in view of the
illegal uses to which it is subject in the hands of the Church
of Latter-Day Saints, whether incorporated or unincorporated.
The conditions for claiming possession of it by the members
of the sect or community under the act do not at present exist.

The attempt made, after the passage of the act on February
19, 1887, and whilst it was in the President's hands for his
approval or rejection, to transfer the property from the trustee
then holding it to other persons, and for the benefit of differ-
ent associations, was so evidently intended as an evasion of the
law, that the court below justly regarded it as void and with-
out force or effect.

*We have carefully examined the decree, and do not find any-
thing in it that calls for a reversal. It may perhaps re-
quire modification in some matters of detail, and for that
purpose only the case is reserved for further consideration.*

MR. CHIEF JUSTICE FULLER, with whom concurred MR. JUS-
TICE FIELD and MR. JUSTICE LAMAR, dissenting.

I am constrained to dissent from the opinion and judgment just announced. Congress possesses such authority over the Territories as the Constitution expressly or by clear implication delegates. Doubtless territory may be acquired by the direct action of Congress, as in the annexation of Texas; by treaty, as in the case of Louisiana; or, as in the case of California, by conquest and afterwards by treaty; but the power of Congress to legislate over the Territories is granted in so many words by the Constitution. Art. 4, sec. 3, clause 2.

And it is further therein provided that "Congress shall have power to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

In my opinion Congress is restrained, not merely by the limitations expressed in the Constitution, but also by the absence of any grant of power, express or implied, in that instrument. And no such power as that involved in the act of Congress under consideration is conferred by the Constitution, nor is any clause pointed out as its legitimate source. I regard it of vital consequence, that absolute power should never be conceded as belonging under our system of government to any one of its departments. The legislative power of Congress is delegated and not inherent, and is therefore limited. I agree that the power to make needful rules and regulations for the Territories necessarily comprehends the power to suppress crime; and it is immaterial even though that crime assumes the form of a religious belief or creed. Congress has the power to extirpate polygamy in any of the Territories, by the enactment of a criminal code directed to that end; but it is not authorized under the cover of that power to seize and confiscate the property of persons, individuals, or corporations, without office found, because they may have been guilty of criminal practices.

The doctrine of *cy-près* is one of construction, and not of administration. By it a fund devoted to a particular charity is applied to a cognate purpose, and if the purpose for which this property was accumulated was such as has been depicted, it

cannot be brought within the rule of application to a purpose as nearly as possible resembling that denounced. Nor is there here any counterpart in Congressional power to the exercise of the royal prerogative in the disposition of a charity. If this property was accumulated for purposes declared illegal, that does not justify its arbitrary disposition by judicial legislation. In my judgment, its diversion under this act of Congress is in contravention of specific limitations in the Constitution; unauthorized, expressly or by implication, by any of its provisions; and in disregard of the fundamental principle that the legislative power of the United States as exercised by the agents of the people of this republic is delegated and not inherent.